MRS. GEORGIA R. WADE, et al., v. W. H. WHITSITT, JR., et al.

Middle Section.    October 13, 1928.

Petition for Certiorari denied by Supreme Court, April 13, 1929.

Norman Farrell, Baxter Cato and E. J. Smith, of Nashville, for appellants.

W. E. Norvell, Jr., and E. J. Walsh, of Nashville, for appellees.

FAW, P. J. The bill in this case was filed in the chancery court of Davidson county, Part 2, on December 14, 1925, by Mrs. Georgia R. Wade, Mrs. Edy Dean and Mrs. Annie Holman, executrices of the estate of Mrs. D. A. Reese, deceased, residents and citizens of Davidson county, Tennessee, as complainants against W. H. Whitsitt, Jr., a resident of Davidson county, Tennessee, State Bank & Trust Company, a corporation, and Commerce Union Bank, a banking corporation doing business in Davidson county, Tennessee, as defendants.

On final hearing, the Chancellor dismissed complainants' bill against State Bank & Trust Company and Commerce Union Bank and granted a recovery in favor of complainants against W. H. Whitsitt, Jr., for the sum of $3268.65 and the costs of the cause.

The complainants appealed to this court from so much of the Chancellor's decree as dismissed their bill against the defendant banks and from so much of the decree as disallowed attorney's fees against defendant Whitsitt.

The determinative issues of fact and law are stated clearly and concisely in the written "findings and opinion" filed by the Chancellor and made a part of the record, as follows:

"Finding and Opinion.

"This is a suit to recover on an agreement alleged to have been made by the defendant State Bank & Trust Co. acting through

its officer and agent, defendant Whitsitt, with complainant, that if she would release and discharge a lien on certain lands in West Nashville the bank would see that she was paid her debt.

"It is in substance averred in the bill that Mrs. Wade, executrix of the estate of her mother, Mrs. Reese, held a note for $2000, secured by deed of trust on certain lots in West Nashville, which was delivered to the State Bank & Trust Company for collection. The bank held some lien notes or a mortgage on the property which was subordinate to Mrs. Wade's lien, and, acting through defendant Whitsitt, agreed if Mrs. Wade would release and discharge her lien and put the whole matter in the bank's hands that it would see that she was paid her debt. This it has failed and refused to do.

"The State Bank & Trust Company was consolidated with the Commerce Union Bank in January, 1924, and these banks deny liability, alleging that the State Bank & Trust Company made no such agreement; that Whitsitt had no authority to enter into such agreement for the State Bank & Trust Company, and that Mrs. Wade, without the knowledge or authority of this bank, cancelled her lien and lost her security.

"The defendant Whitsitt denies that he represented the State Bank & Trust Company in procuring Mrs. Wade to cancel her lien, but alleges that he was representing himself and that it was a purely personal matter between Mrs. Wade and himself. He avers that Mrs. Wade agreed to accept $1700 for her debt and that he paid her interest thereon. He admits that he is indebted to Mrs. Wade by reason of the transaction involved, which he has been unable to pay."

The material facts as disclosed by the record follow:

"Mrs. Wade is a co-executrix of her mother's estate, which held a note for $2000 secured by deed of trust on certain lands in the Steger Subdivision of West Nashville. She delivered these papers to the State Bank & Trust Company for collection and was given a receipt to which the name of this bank was signed by W. H. Whitsitt, Jr. Sometime after this note was placed with the bank, Mr. Whitsitt informed her that the bank held a second lien on these lots and that if she would release her lien they could sell the property and would pay her note. She communicated this information to her attorney, who had an interview with Whitsitt, who confirmed his statement to Mrs. Wade. Thereupon Mrs. Wade's attorney advised her to make the release as Whitsitt had requested and she did so.

"Mrs. Wade was a customer of the bank for some time before and after this transaction took place. She had an account with the bank, both personal and as executrix. The note was

left with the bank for collection in September, 1921, and she released the lien at the Register's Office in April, 1922, but she said nothing to the bank about her mistreatment by Whitsitt and her failure to get her money under the agreement until her attorney, Mr. Cato, mentioned it to the defendant Commerce Union Bank in August or November, 1925. During this period of time she was importuning Whitsitt for a settlement of her debt. She agreed to accept $1700 from Whitsitt in settlement of the debt which she had lost by reason of the release of the lien, and accepted one interest payment thereon from him of $51 and a check for about $100 for another interest payment, which check was dishonored by the bank upon which it was drawn. She had several business transactions with Whitsitt affecting her mother's estate, before she turned this note over to the bank for collection, with which the State Bank & Trust Company was in no manner connected. The record does not reveal that the bank had any similar dealings to the one involved with Mrs. Wade or any other person through Whitsitt. She did not speak to any other officer of the bank about this transaction although they were accessible to her and she was almost daily in the bank, until several years after the lien had been cancelled and loss had resulted. When she spoke to the bank about this agreement several years afterwards, they disclaimed any liability thereunder or knowledge of it. The State Bank & Trust Company, or its successor, the Commerce Union Bank, had no knowledge of this agreement of Whitsitt's with Mrs. Wade, and did not profit thereby.

"Whitsitt was about twenty-two or -three years old, and the Auditor of the State Bank & Trust Company, when she placed the note in the bank for collection. He was with the State Bank & Trust Company from 1917 to 1922, first the Book-keeper, then as Teller, and afterwards as Auditor. He resigned as Auditor in June, 1922. He held this position at the time Mrs. Wade claims he agreed, for the bank, that it would pay her debt if she would cancel her lien and permit the bank to sell the property. His duties as Auditor were to see that the bank accounts were properly kept, make releases of real estate notes paid to the bank, and to perform such other duties as might be assigned him by the Board of Directors, but it does not appear that any other duties or powers were assigned to him. This authority is in writing appearing in the minutes of the Board of Directors. He traded in real estate on his own personal account while he worked for the bank. The bank had not had a real estate department since 1920. The collateral which the bank held and which was a second lien on these lots was attached to

a note of Myers to the bank for about three or four hundred dollars, and this collateral was returned by the bank to Myers several days before or the same day Mrs. Wade released her lien.

"Whitsitt's power as Auditor did not confer upon him the authority to make this agreement for the bank. An auditor acts under special or express authority and his acts bind the bank only when in line therewith or within the scope of his authority.

"The chief executive officers of a bank, President and Cashier, by authority of their offices, do not possess inherent power to make an agreement not to plead the statute of limitations, and a bank can be held liable on such promise by the President only by a custom that he has exercised such power. Morgan & Co. v. Bank, 13 Lea 242-3.

"There is no proof in this case of a custom or usage of the bank by which Whitsitt exercised the power to make agreements for the bank, of the character involved.

"A banking corporation has no power to lend its credit to another by becoming guarantor for him because the guaranty by a bank, without benefit to itself, of the debt of another in which it has no interest, is an adventure beyond the confines of banking business. Its powers in this respect are limited to the protection of its own rights or as an incident to the transaction of its own business. Michie on Banks & Banking, Vol. 1, sec. 99; R. C. L., sec. 53, p. 425.

"Before the time the alleged guaranty became effective by the release of the lien, the bank had surrendered to Myers the collateral it held, which was a second lien on the property, and it had no rights to protect, and it is certainly not an incident to the business of collecting a note for the bank to guarantee its payment. This collateral, with others, secured a debt of Myers to the bank about three or four hundred dollars, while the alleged guaranty of the bank would have secured an indebtedness to the complainant of over two thousand dollars.

"If the chief executive officers of a bank have no inherent power to make such an agreement as the one involved, and there was no custom or usage by which they exercised such power, or if such an agreement is beyond the powers of a banking corporation, it follows that a minor official of the bank could not make a valid and binding agreement of this kind for the bank.

"The bank held the complainant's note for collection only, and held a second lien as collateral to the Myer's note, which collateral it had surrendered before complainant released her lien, and it is insisted that the bank agreed, if complainant

would release her lien and put the matter in his hands, it would see that she was paid her debt of two thousand dollars. This is an unusual contract, and an unusual liability for a bank to assume. If the chief executive officers of a bank and its Auditor had no inherent power to make such an agreement, and there was no custom or usage by which they exercised such power, or if the agreement was beyond the scope of the powers of a bank, it could not be reasonably insisted that the Auditor acted within the scope of his apparent authority. Apparent authority can only exist in an agent where the principal is legally authorized to act. Apparent authority is inferred from the conduct and acts of a principal, who has authority to act, towards an agent, whereby a party is misled into believing that the agent has authority to act.

"The subsequent conduct of Mrs. Wade shows that she considered Whitsitt and not the bank obligated to pay her debt.

"The record reveals that from April, 1922, to August or November, 1925, a period of more than three years, Mrs. Wade treated Whitsitt as the party liable to her, and notwithstanding the bank was abundantly able to pay, if liable, she agreed to accept $1700 from Whitsitt in settlement of her debt, which was less than the debt; that during this period of time, although almost daily in the bank, she made no claim or demand upon the bank for payment; that she learned about two months after she made this release that Whitsitt was no longer connected with the bank. In this long period of time, with every opportunity and incentive to demand payment of the bank, she looked alone to Whitsitt for the payment of the debt. She waited until all of the property upon which she had a lien, and that which Whitsitt purchased or traded for with the proceeds of this property had been disposed of by him before she made any demand upon the bank. She made no demand on the bank for payment of this debt until it became apparent that Whitsitt did not intend to pay her. The bank did not receive any benefit from the transaction, either directly or indirectly.

"Whitsitt reaped the benefit of his representations to Mrs. Wade by realizing from the property upon which she released the lien, sums largely in excess of her debt, which he appropriated to his own use. He does not deny liability to her, but admits that he failed to pay her the $1700 which she agreed to accept if he would settle.

"Evidence of the statements or admissions of Whitsitt are not admissible against the bank for the purpose of establishing his authority as agent to act for the bank, nor can his authority be established by showing that he acted as agent, and claimed

to have the powers which he assumed to possess. His authority is in writing and he cannot extend its scope by his own declarations. His acts and statements cannot be made use of against the bank until the fact of his agency has been shown by other evidence, though his statements and admissions are admissible against himself. Neither can apparent authority be shown by the agent's declarations. Such authority is inferred from the acts and conduct of the principal holding the agent out as possessing authority, not by the agent's statement. Mechem on Agency (1 Ed.), sec. 100, pp. 73-4, and 5th Ed., sections 285-6.

"This is not a suit upon the note and deed of trust, but upon the agreement which it is claimed Whitsitt made acting for and in behalf of the bank. Mrs. Wade is not entitled to recover attorney's fees in this character of suit, but is entitled to a judgment against Whitsitt for the amount of the note, with interest to date, which is the damage she suffered by reason of breach of the agreement, sued on in the case.

"Decree accordingly.

"Newman,
"Chancellor."

There is no specific assignment that the Chancellor erred in any of his findings of fact, or that he failed to find any material fact. However, we have carefully examined the entire record, and we have considered all the evidence admitted below in reaching our conclusions with respect to the questions made by the assignments of error.

The appellants' first assignment of error is that "the Chancellor erred in holding that the bank had no power to make the agreement and that Whitsitt had no authority to bind it to such an agreement."

We concur in the finding of the Chancellor that the defendant bank had no rights or interest to protect by making such an agreement as that which complainants are seeking to enforce against it in this case, and it received no benefit therefrom. The alleged agreement to guarantee the payment of the note in question was, therefore, merely an effort to lend the credit of the bank for the accommodation of complainants.

"A banking corporation cannot lend its credit to another by becoming surety, endorser, or guarantor for him. It cannot for the accommodation of another endorse his note or guarantee the performance of obligations in which it has no interest. Such an act is an adventure beyond the confines of the banking business, and, when its true character is known no rights grow out of it, though it has taken on in part the garb of a lawful transaction." 3 R. C. L., p. 425.

"Neither as included in its powers nor incidental to them is it a part of a bank's business to lend its credit. If a bank could lend its credit as well as its money, it might, if it received compensation and was careful to put its name only to solid paper, make a great deal more than any lawful interest on its money would amount to. If not careful, the power would be the mothers of panics, and if no compensation was received, there is the additional reason, if any is needed, that such a power is in derogation of the rights and interests of stockholders, and at all events could not be exercised without the consent of all.

"Indeed, lending credit is the exact opposite of lending money, which is the real business of a bank, for while the latter creates a liability in favor of the bank, the former gives rise to a liability of the bank to another." 1 Morse on Banks and Banking (6 Ed., 1928), sec. 65, pp. 183-184.

The argument offered in support of the first assignment of error, supra, is mainly directed to the proposition that Whitsitt had "apparent authority" to bind the bank to the agreement which Whitsitt undertook to make with Mrs. Wade, but substantially the only facts disclosed by the record upon which it is sought to predicate this argument are that Whitsitt, as "Auditor" of the bank, occupied a desk outside the "cages" occupied by the subordinate employees and in that part of the banking room occupied by the desks of the President, Cashier and Assistant Cashier, and that Whitsitt's name, with his official designation as Auditor, was printed on the bank's stationery along with the executive officers of the bank.

But if (as we hold with the Chancellor) the agreement which Whitsitt undertook to make with Mrs. Wade was one beyond the lawful powers of the bank, it would merely extend this opinion without serving any useful purpose to enter upon a discussion of the doctrine of "apparent authority," or "inferred authority," of an agent of a bank, for it is necessarily limited to such authority as the corporation could legally confer. 1 Morse on Banks and Banking (6 Ed.), sec. 98, pp. 253-254.

One dealing with an officer or agent of a bank "must be held to a knowledge of the law and of facts to which he would have been led by the exercise of such diligence as men of ordinary prudence display under similar circumstances, and to correct reasoning upon such facts." Morse, sec. 98, p. 242. The first assignment of error is overruled.

The second assignment of error is that "the Chancellor erred in holding that the subsequent conduct of Mrs. Wade shows she considered Whitsitt and not the bank her debtor, and that she was estopped to proceed against the Bank."

It will be remembered that in his findings, hereinbefore copied, the Chancellor said:

"The subsequent conduct of Mrs. Wade shows that she considered Whitsitt and not the bank obligated to pay her debt.

"The record reveals that from April, 1922, to August or November, 1925, a period of more than three years, Mrs. Wade treated Whitsitt as the party liable to her, and notwithstanding the bank was abundantly able to pay, if liable, she agreed to accept $1700 from Whitsitt in settlement of her debt, which was less than the debt; that during this period of time, although almost daily in the bank, she made no claim or demand upon the bank for payment; that she learned about two months after she made this release that Whitsitt was no longer connected with the bank. In this long period of time, with every opportunity and incentive to demand payment of the bank, she looked alone to Whitsitt for the payment of the debt. She waited until all of the property upon which she had a lien, and that which Whitsitt purchased or traded for with the proceeds of this property had been disposed of by him before she made any demand upon the bank. She made no demand on the bank for payment of this debt until it became apparent that Whitsitt did not intend to pay her."

In our opinion, the proof supports the statements of fact in the above quotation from the Chancellor's findings, and we think the Chancellor was justified in drawing the inference from the conduct of Mrs. Wade, thus described, that "she considered Whitsitt and not the bank obligated to pay her debt."

But, so far as we have been able to discover, the Chancellor did not, either in his written "findings and opinion," or elsewhere in the record, "hold" or adjudge that "she (Mrs. Wade) was estopped to proceed against the bank." Whether the Chancellor thought that Mrs. Wade "was estopped to proceed against the bank," as a legal consequence of the fact that "she considered Whitsitt and not the bank obligated to pay her debt," we do not know. Moreover, it is unnecessary for us to express an opinion on the question of estoppel, as, in the view we take of the case, a decision of that question is not essential to a determination of the issues. The second assignment of error is overruled.

What we have said in response to the first and second assignments of error disposes of the third and fourth assignments, and the latter two assignments are likewise overruled.

Through their fifth assignment of error the appellants complain of the action of the Chancellor in sustaining objections made by defendants to a certain line of testimony of Mrs. Wade and Judge Aust, witnesses for complainants.

At the conclusion of the deposition of Mrs. Wade, the following appears: -

"The defendant Banks object to all testimony by foregoing witness regarding statements of Whitsitt that he was representing the State Bank & Trust Co. because incompetent in that agency cannot be proven by statements of Agent.

"Defendants move to exclude this testimony.

"E. J. Walsh,
"Solr.

"Sustained as to Deft. Banks.

"Exception by Complt.

"Newman, Chancellor."

And at the conclusion of one of the depositions of Judge Aust, the following appears:

"The Defendants Commerce Union Bank & State Bank & Trust Co. object to all testimony of this witness regarding statements of Whitsitt that he was representing the State Bank & Trust Co. on the grounds of incompetency and that agency cannot be proven by statements of agent, and defendants move to exclude this evidence.

"E. J. Walsh.

"Sustained as to Banks.

"Exception by Complainant.

"Newman, Chancellor.

Additional objections of similar tenor and substance, although couched in somewhat different verbiage, and which were sustained by the Chancellor, appear in the course of Judge Aust's deposition.

In support of the fifth assignment of error it is said that the objections were too general and that no objections were made to specific matter.

We do not think these objections were "too general" in the sense that they failed to state the ground of the objection, as, in each instance, it appears that the objection was expressly grounded on the proposition that agency cannot be proved by statements of the agent. Moreover, for obvious reasons, a complaint in the appellate court that an objection to testimony is "too general" does not have the same force when directed to the action of the trial court in sustaining an objection as when the objection was overruled.

We are also of the opinion that the assignment should not be sustained on the ground that "no objections were made to specific matters" (if by that is meant that the objections should have been overruled because they did not, in each instance, set out ipsissimis verbis the testimony to which the objection was made). The objectionable line of testimony was clearly indicated and the objectionable statements, although interspersed with competent testi-

mony on other subjects, may, in this case, be easily identified and segregated.

The question then is, were the declarations of Whitsitt to Mrs. Wade and Judge Aust, which tended to show that he was the agent of defendant bank in the transaction in question, competent and admissible evidence against the bank?

Sections 944 and 945 of 2 Jones on Evidence (2 Ed., 1926), pp. 1741-1749, read as follows:

"944. General Rule.—The declarations, acts or representations of an agent, within the scope of his authority and in execution of his agency, are permitted to be proved and are considered and treated as the declarations, acts and representations of his principal, and constitute pertinent and legitimate evidence. What is so done, by an agent, is done by the principal through him, as through a mere instrument. So, whatever is said by an agent, either in making a contract for his principal, or at the time and accompanying the performance of any act within the scope of his authority, having relation to, and connected with, and in the course of, the particular contract or transaction in which he is then engaged, or, in the language of the old writers, dum fervet opus, is, in legal effect, said by his principal and admissible in evidence against such principal. But, on the other hand, it is well established that parties are not chargeable with the declarations of their agents, unless such declarations or statements are made during the transaction of business by the agent for the principal, and in relation to such business and within the scope of the agency; in other words, unless they may be deemed a part of the res gestae or stand as declarations of the principal himself under recognized rules of the substantive law of agency. When a statement, declaration, admission, or act of an agent is admissible as part of the res gestae, the reason for its admission in evidence is plain: it is because such declaration or act, made at the very time of the birth of the contract or transaction, stands sponsor to it and is therefore treated as the direct act of the principal and really an integral part of the whole negotiation or incident. But Sir William Grant, in the leading case on this subject, said:

"'What the agent has said may be what constitutes the agreement of the principal, or the representation or statements may be the foundation of or the inducement to the agreement. Therefore, if writing is not necessary by law, evidence must be admitted to prove the agent did make that statement or representation. So, in regard to acts done, the words with which those acts are accompanied frequently tend to determine their quality. The party, therefore, to be bound by the act, must be

affected by the words. But, except in one or the other of those ways, I do not know how what is said by an agent can be evidence against his principal.'

"The declarations of an agent while acting within the scope of the business and authority are original evidence. They are the ultimate fact to be proved and not an admission of some other fact; and the only question is whether the declarations were made and relied upon. Cases wherein acts or declarations of a servant or agent are admissible because spontaneous and contemporaneous with an accident or some other circumstance of stress in issue are to be distinguished. Such instances form the subject of treatment in another chapter; for obviously admissibility in such cases is in no sense dependent upon the fact of relation as servant or agent and the same declaration or act, made by a stranger or third person having no relationship whatever to the parties to the cause would be equally admissible, if admissible at all, under such circumstances.

"945. Preliminary Proof of Agency.—As shown in the preceding section, before declarations or admissions of a servant or agent are admissible against his master or principal, it must first appear that the act or statement in question was expressly or impliedly authorized. The first essential in this regard is proof of the fact of agency. And the act or statement may not be used to establish such fact. Agency must be proved aliunde. This rule is of long standing and universal recognition. It is but a form of stating, or particularization of, that broad rule which underlies the entire field of evidence, that when evidence is admissible only in the event that it conforms to certain conditions, as a prerequisite to the admission of the evidence the existence of the conditions must first be shown by way of foundation. We show above the existence of similar rules with regard to laying a foundation for the admission of statements by a partner, or co-conspirator, as binding upon a party to the cause. And, as in the case of admissions of a partner or co-conspirator, the necessary foundation of proof of the existence of the relation of principal and agent between the admitting party and the party sought to be charged cannot be laid by mere proof of the admissions of the agent as to the fact of his agency. Admissions of authority, made by the agent himself, are plainly not within the scope of his authority as agent, and the introduction thereof in evidence would serve no useful purpose and only result in begging the issue. In fact, the declarations of the alleged agent are not competent to prove such agency although they are accompanied by acts purporting to be acts of agency. But, of course, such declarations and

acts are competent if there is proof of former similar acts or declarations recognized or approved by the principal.

"An agency, like any other fact, may be proved by circumstances and by evidence of the conduct of the parties and of the relation that previously existed between them. Whenever there is independent evidence tending to prove an agency, it is competent to prove all the acts of the alleged agent pertaining to the business, as well as his declarations that he was acting as agent in the particular transaction. And the order of proof is not necessarily rigid. Evidence need not invariably be introduced in the first instance of the existence of the relation of principal and agent where, in the discretion of the trial court, it appears that the purposes of trial are better served by permitting a variation of the order."

In Mechem on Agency (2 Ed.), sec. 285, it is said:

"Agent's authority cannot be establishd by his own statements or admissions.—The authority of an agent, and its nature and extent where these questions are directly involved, can only be established by tracing it to its source in some word or act of the alleged principal. The agent certainly cannot confer authority upon himself or make himself agent merely by saying that he is one. Evidence of his own statements, declarations or admissions, made out of court therefore (as distinguished from his testimony as a witness), is not admissible against his principal for the purpose of establishing, enlarging or renewing his authority; nor can his authority be established by showing that he acted as agent or that he claimed to have the powers which he assumed to exercise. His written statements and admissions are as objectionable as his oral ones, and his letters, telegrams, advertisements and other writings cannot be used as evidence of his agency. The fact that the agent has since died does not change the rule.

"Where his authority is in writing he cannot extend its scope by his own declarations. His acts and statements cannot be made use of against the principal until the fact of the agency has been shown by other evidence."

And in section 289 of same volume it is said:

"The agent's authority moreover, may not be shown merely by proving that he acted as agent. A person can no more make himself an agent by his own acts only than he can by his own declarations or statements. If his acts can be connected with the principal in some way, as by showing that the principal knew of them and assented to them, a different result ensues; and where the acts are of such a public or intimate nature, so notorious or so long continued as reasonably to justify the in-

ference that the principal must have known of them and would not have permitted them to continue if they were unauthorized, evidence of them is admissible as against the alleged principal."

It is argued in the brief for appellants that Whitsitt's agency for the bank in the transaction here involved was "established" by other evidence, and his declarations were "merely confirmative and corroborative," and therefore competent.

It is true that if the declarations of the alleged agent reasonably tend to throw light on other issues in the case, they may be admitted, if the fact of the agency is shown by other evidence; and the mere order in which the proof is admitted is not vital. (Mechem, sec. 288, and Notes to sec. 285, supra). But we are not prepared to hold that such declarations of the alleged agent may "be used in corroboration" of other evidence tending to show the fact of the agency; although one case (White Sewing Machine Company v. Horkan, 7 Ga. App., 283) is cited in the Notes to sec. 285, Mechem on Agency, supra, as so holding.

Aside from the declarations of Whitsitt to which Mrs. Wade and Judge Aust testify, we find no evidence in the record which, in our opinion, shows that Whitsitt had authority, either real or apparent, to bind the defendant bank to the agreement on which complainants are seeking a recovery, and the testimony of Mrs. Wade and Judge Aust concerning such declarations of Whitsitt was properly excluded as evidence against defendant bank.

We are inclined to the opinion that if the declarations of Whitsitt, to the effect that he was acting for the bank in the transaction in question, had been admitted without objection, they could not be received as evidence that Whitsitt had the powers which he thus assumed to exercise. This is for the reason that the prohibition of the establishment of the agent's authority by his own statements or declarations is more than a mere rule of evidence. It partakes of the nature of a substantive rule of law. It is somewhat analogous to the statutory rule which forbids the husband or wife to "testify as to any matter that occurred between them by virtue of or in consequence of the marital relation." (Shan. Code, sec. 5596).

In a case applying the statute just cited, our Supreme Court (through Mr. Chief Justice Green) said: "Even in cases where the testimony of the husband and wife as to such matters has been admitted without objection, it has been held insufficient to set up a contract between them to the prejudice of the husband's creditors, unless corroborated." Crane & Co. v. Hall, 141 Tenn., 556, 563, 213 S. W. 414.

However, we make no ruling in the instant case upon the effect of evidence of the declarations of an alleged agent tending to show

the fact of his agency when admitted without objection, as that question is not presented on this record.

But for the reasons before stated, the appellant's fifth assignment of error is overruled.

The sixth (and last) assignment of error is that "the Chancellor erred in not allowing counsel fees to complainants, in addition to the face of the $2000 note and interest."

We assume that this assignment is directed to the action of the Chancellor in declining to render a judgment against Whitsitt for attorneys' fees. All that is said on the brief in support of this assignment is that "the trust deed released, on the faith of the contract, provided for counsel fees."

The only provision of "the trust deed released" to which the above statement could possibly have reference is as follows: "In case of a sale under this deed of trust the proceeds will be applied by the Trustee as follows: First—to pay all costs and charges of executing this trust, and the expenses of any litigation that may arise on account of the execution and enforcement of this trust."

The note secured by the trust deed contains no provision for the payment of attorneys' fees, or "counsel fees."

Whitsitt was not a party to the trust deed, and the present "litigation" did not "arise on account of the execution and enforcement" of said trust deed.

It is well settled that "a litigant ordinarily cannot collect his attorneys' fees from his adversary, however wrongful may have been the suit, or however groundless the defense. . . . The general rule is that counsel fees are not recoverable as damages. The law awards to the successful party his taxable costs, but the fees which he pays to counsel are not taken into consideration." Corinth Bank & Trust Co. v. Security National Bank, 148 Tenn., 136, 154, 252 S. W., 1001. We agree with the Chancellor that complainants are "not entitled to recover attorneys' fees in this character of suit," and the sixth assignment of error is overruled.

It results that the decree of the chancery court dismissing complainants' bill against the State Bank & Trust Company and the Commerce Union Bank is affirmed. The costs of the appeal will be adjudged against the complainants and the surety on their appeal bond.

Crownover and DeWitt, JJ., concur.