HAMMOND et ux. v. HERBERT HOOD CO.—221 S. W. (2d) 98.

Western Section.   December 17, 1948.

Petition for Certiorari denied by Supreme Court, May 6, 1949.

Burch, Porter & Johnson, Memphis, for appellant.

Lake Hays, Memphis, for defendants.

WALDROP, S. J. This suit was instituted in the Chancery Court of Shelby County by Herbert Hood, Sr., and Herbert Hood, Jr., composing a partnership, engaged as real estate brokers or agents under the firm name of Herbert Hood Company, against defendants, James Thomas Hammond and wife, Beatrice R. Hammand, for a real estate commission alleged to have been lawfully earned by complainants by reason of services performed by them incident to the sale of certain real property of defendant, Mrs. Beatrice R. Hammond, same being a highly developed acreage in Shelby County and known as: "Mimosa." The case was heard by the Chancellor with the intervention of a jury and resulted in a verdict on behalf of complainants and against both defendants in the amount sued for, namely $3375.00, and defendants appealed in error.

It was the contention of complainants in their bill and by their proof that the real estate involved was the property of defendant, Beatrice R. Hammond, while her husband, codefendant, Colonel James Thomas Hammond, acting as the agent of his wife and in his own behalf, engaged complainants, as real estate brokers, to sell said property. That acting upon such employment that they vigorously engaged in an effort to effect a sale thereof, showing said property to different prospective buyers with defendants' consent and approval, and did as a result of such efforts find a purchaser who was acceptable to defendants, and was at the time, ready, able and willing to buy upon the agreed terms; although the sale was never consummated by reason of defendants' wrongful acts. Complainants charged that defendant, James Thomas Hammond, was the duly authorized agent of his wife, Beatrice R. Hammond, with full

authority to bind her in the premises, and so held himself out with the knowledge and permission of his wife in such manner that both defendants were estopped to deny his agency; but that if defendant, James Thomas Hammond, was not duly authorized, or estopped to deny his authority, that such defendant would then be liable himself by reason of such misrepresentation of authority. It was further contended by complainant that James Thomas Hammond aside from binding his wife by reason of an agency also bound himself individually by an alleged personal agreement to pay a commission to complainants as brokers.

Defendants filed separate answers, each denying the employment of complainants for the sale of said property or any agreement to pay a commission for the sale of same. Mrs. Hammond, as owner, denied that her husband was authorized to offer for sale or sell said property, and Colonel Hammond denied that he had such authority from his wife and insisted that he had fully made known his wife's ownership of the property and only proposed and agreed with complainants that they might submit any offer which they might receive, and that he would pass on to his wife any such offer which he deemed agreeable as to price and terms. Defendants denied that they assented to or approved the showing of the property to prospective purchasers, and denied that a contract for the sale of the property had been entered into at the alleged price of $67,500.00 with one ready, able and willing to purchase and upon terms agreed upon, or agreeable to defendants. Defendant, James Thomas Hammond, admitted the receipt of an offer in such amount for the property but contended that the terms stipulated were not agreeable, and in at least one respect were impossible of performance.

Counsel for both complainants and defendants submitted proposed issues for consideration and decision by the jury. However, the Chancellor composed and submitted two questions for the jury's consideration and determination, the second to be ignored if the first were answered in the affirmative. The questions were as follows:

"1: Did the complainants under authority from defendant James Thomas Hammond, as agent for his wife, defendant Beatrice R. Hammond, produce a purchaser at the authorized price of $67,500 cash for the property known as Mimosa?"

"2: If your answer to issue number one is no, then answer: Did complainants under authority from defendant James Thomas Hammond, individually, produce a purchaser at the authorized price of $67,500 cash for the property known as Mimosa?"

The jury answered the first question in the affirmative and as per instructions gave no answer to the second.

The record fairly discloses the following facts about which there is little dispute: Complainants approached defendant James Thomas Hammond, about May 1947 concerning the sale of the real estate in question claiming to have a prospective purchaser at a figure greatly in excess of the figure later considered. This defendant manifested some interest in selling, and while this first prospect was immediately lost sight of, complainants pursued their effort to effect a sale, and were encouraged to some extent at least by the attitude and conduct of defendant, James Thomas Hammond. Title to the property was vested in defendant, Mrs. Beatrice R. Hammond, and this fact was known or might have been known by reasonable inquiry upon the part of complainants.

No exclusive listing was had by complainants and it appears that other brokers were likewise active in undertaking a sale. Upon one occasion defendant, Mrs. Hammond, was present when a prospect was shown the property by one of complainants and manifestly offered no objection.

Negotiations pertaining to the sale were carried on between complainant, Herbert Hood, Sr., and defendant, James Thomas Hammond. Neither a definite price nor terms appear to have been discussed at any time during the early negotiations, and the record fails to disclose that these matters were ever at any time mentioned to Mrs. Hammond.

In August 1947, after defendant, James Thomas Hammond, had gone to his ranch in Wyoming, and after the exchange of some correspondence in which the brokers manifested a much keener interest in effecting a sale than defendant, Complainant Hood mailed him a written offer on behalf of one Arthur Fulmer for the conveyance of certain other real estate owned by Fulmer and the sum of $40,000.00 cash in exchange for the described real estate, "Mimosa." To this offer said defendant made no immediate response, and shortly thereafter complainant called said defendant by phone to urge an acceptance, but to no avail.

Out of this latter conversation, however, a sharply controverted matter arose and one of importance to a determination of this controversy. Complainant Hood testified that a direct and positive offer to sell this real estate at the price of $67,500.00 cash was made by defendant Hammond, while the latter insisted that his mention of the figure of $67,500.00 was not a direct offer to sell at such figure, but a price which he would submit to his

wife, provided satisfactory terms could be reached. Immediately thereafter said complainant with the approval of his prospect Fulmer sent the following wire:

"Fulmer accepts your counter offer of $67,500 cash for Mimosa. Contracts in mail. (Signed) Herbert Hood."

Contemporaneously or following the sending of this telegram, there was mailed to said defendant Hammond's Wyoming address a contract for the conveyance of said property at the price of $67,500.00 executed by the said Arthur Fulmer, bearing date August 25, 1947, and providing, among other things, for $1000.00 earnest money and as payment upon the purchase price, stipulated that the taxes for the year 1947 were to be prorated; and further stipulated that the seller would promptly submit an abstract of title and allow fifteen days after delivery of abstract for the examination of title, and further provided that "Possession of premises to be given with deed". The trade was not consummated and shortly thereafter the property was exchanged for city property and cash and this suit resulted. Further facts will best appear in determining the issues presented.

The liability of defendant, James Thomas Hammond, will first be considered.

As heretofore stated, all, or essentially all transactions out of which this controversy arose were conducted on behalf of defendants solely by defendant, James Thomas Hammond. And inasmuch as the real estate involved was the property of Mrs. Hammond, then the liability of James Thomas Hammond, if any, must be necessarily predicated upon his relationship as agent for his wife, or upon some independent binding contract to pay complainant a commission for the sale of said property.

As heretofore observed, complainants alleged that he was acting in the capacity of agent for his wife. Furthermore, the one issue submitted to and considered by the jury was, "Did the complainants under authority from defendant James Thomas Hammond, as agent for his wife, defendant Beatrice R. Hammond, produce a purchaser, etc." This question was answered by the jury in the affirmative.

■ This being a law case, findings of the jury are binding upon this court, if there is evidence to support their verdict. Williams' Code, Secs. 9037 and 10579; Johnson v. Graves, 15 Tenn. App. 466.

Defendants insist that the record affords no evidence to the effect that Mrs. Hammond authorized her husband to make a contract with complainants to sell her real estate. They point to the language employed by this court in the case of W. W. Dillon & Co. v. Sharber, 19 Tenn. App. 488, 90 S. W. 2d 533, 542, as follows:

"The mere fact that Dr. Sharber was the husband of his codefendant, Mrs. Kate T. Sharber, did not constitute him her agent for the purpose of employing complainant to sell her property and contracting to pay commissions. 'A husband has not, by virtue of the marital relation, any authority to act as the agent of his wife or to make any agreement on her behalf binding her rights without her consent. His authority as agent for his wife is no more extensive in scope or longer in duration than that of any other agent similarly constituted.' 13 R. C. L., p. 1168, par. 194."

■ While it is true that the marital relationship alone does not supply evidence of a principal and agency relationship giving the husband the power of an agent to contract for a sale of the wife's real estate or to pay

commissions therefor, yet this relationship and the course of dealings of a husband and wife may be considered along with any other fact tending to establish such agency. The problem presented is whether or not there was evidence upon which the jury's verdict could be rested. We think that unquestionably there was.

"It is true that an agent's authority cannot be shown by his own statements made out of court, or merely by proving that he claimed or undertook to act as agent for an alleged principal; but if there is independent evidence tending to prove an agency, it is competent to prove all the acts of the alleged agent pertaining to the business, as well as his declarations that he was acting as agent in the particular transaction, and the order of proof is not necessarily rigid. An agency, like any other fact, may be proved by circumstances and by evidence of the conduct of the parties, such as by showing that the alleged principal knew of the acts of the alleged agent and assented to them. Wade v. Whitsitt, supra [9 Tenn. App. 436], pp. 446, 449; Jones on Evidence (2 Ed., 1926), sections 944-945, pp. 1741-1949; Mechem on Agency (2 Ed.), sections 285 and 289." Drinnon v. Willis, 14 Tenn. App. 483.

In this connection the record reveals, among other things, that Mrs. Hammond was a woman of means and that her husband was a very active and successful business man and was so recognized by his wife. That most of the business deals were left entirely to his decision. That this very property had been conveyed to her by her husband and even at the time was under a deed of trust to secure a rather large indebtedness of her husband; and upon the occurrence of a fire some time prior to this transaction insurance in the sum of $45,000.00

was collected by her husband and she did not know or undertake to ascertain what became of these funds, being content to leave such matters to the good judgment of her husband. In addition, after some arrangement was effected with complainants and they were permitted to engage in an effort to find a purchaser Colonel Hammond showed one of complainants over the premises and pointed out the lines; and upon one occasion when a complainant took a prospect to view the property Mrs. Hammond engaged in conversation with said complainant, and this complainant testified that upon this occasion Mrs. Hammond stated that whatever her husband did was satisfactory to her. Manifestly from such evidence the jury were warranted in determining that Colonel Hammond was agent for his wife and had full authority to bind her in the premises.

But do these facts tend to establish the personal liability of defendant, James Thomas Hammond? We think not, but rather to the contrary. Complainants had knowledge from said Hammond that the property belonged to his wife and the actions taken by him were upon her behalf. He was therefore purporting to act as agent for the disclosed principal.

The general principle of law thus applicable is well stated in 2 Am. Jur. 247-8, Sec. 315 as follows:

"If a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone, unless credit has been given expressly and exclusively to the agent, and it appears that it was clearly his intention to assume the obligation as a personal liability and that he has been informed that credit has been extended to him alone. The presumption is that where one known

to be an agent deals or contracts within the scope of his authority, credit is extended to the principal alone and the act or contract is his engagement as if he were personally present and acting or contracting. This presumption prevails in the absence of evidence that credit was given to the agent exclusively, the burden of proof being upon the party seeking to charge such agent exclusively.''

This is the prevailing rule. See Bailey v. Galbreath Bros., 100 Tenn. 599, 47 S. W. 84; and Siler v. Perkins, 126 Tenn. 380, 149 S. W. 1060, 47 L. R. A., N. S., 232. And the jury having found that Colonel Hammond was the agent for his wife, and it being manifest that complainants were cognizant of this fact, it results from the rule stated that there could be no liability imposed upon defendant, James Thomas Hammond, personally, unless it be upon some special contract to that end upon his part, or else it be established that credit was extended alone to him. This question was not passed upon by the jury, but now becomes a proper subject of inquiry *de novo* by this court.

Mutual Life Ins. Co. of N. Y. v. Burton, 167 Tenn. 606, 72 S. W. 2d 778; Carpenter v. Wright, 158 Tenn. 289, 13 S. W. 2d 51.

With respect to this issue the record reveals that in certain instances in negotiating for sale of this property that Colonel Hammond did refer to same as ''our'' property, and otherwise indicate that it was a joint enterprise upon the part of himself and wife. Nevertheless, it is not conceived that these statements are sufficient to overcome the presumption that the transaction was one for the sole benefit of the principal. In the first place it is general practice for an agent to use plural pronouns

in negotiating on behalf of a principal and such use in this instance does not appear to be out of the ordinary. Then the fact that the only controversy herein is one over a commission for the sale of real estate, it would be most extraordinary for one established to be agent of the owner to obligate himself to pay personally a commission for the sale. In addition, while an agent may upon proper consideration render himself liable, the law usually looks upon either the principal or the agent liable, but not ordinarily both.

In view of the allegation contained in the bill, the finding of facts by the jury and the proof in the record we do not think that complainants have established an independent contract upon the part of defendant, James Thomas Hammond, to pay a commission and his liability therefor. It results, therefore, that the suit as to him cannot be sustained.

But a determination as to the liability of defendant, Mrs. Beatrice R. Hammond, presents a more difficult question.

The well recognized rule of law is that where a broker has been employed to sell real estate that he is entitled to his commissions in case he produces a party who is acceptable to the owner, and who is able, ready and willing to buy on the agreed terms. And this is true even though the sale is not ultimately consummated, when the consummation is prevented by the fault, refusal, or defective title of the principal. Cheatham v. Yarbrough, 90 Tenn. 77, 15 S. W. 1076; Woodall v. Foster, 91 Tenn. 195, 18 S. W. 241; Chambers v. Percefull, 28 Tenn. App. 517, 191 S. W. 2d 568; Williston on Contracts, Revised Ed., Sec. 1030A.

In this case there is no dispute as to the acceptability of the proposed purchaser, and his ability to buy; nor, indeed, his willingness to pay the agreed price. However, defendants insist with much force that further material terms were never agreed upon between the parties, that is to say that there occurred no meeting of minds and consequently no contract was established, and that the issues submitted to the jury did not compose this question. This necessitates a rather careful review of the facts incident to this issue.

Arthur Fulmer was a prospective purchaser for the lands involved, and this fact was known to Colonel Hammond. In fact the latter had inspected lands which this prospect offered to exchange. Hammond had gone later to Wyoming and on August 15, 1947, complainants mailed to him a proposed contract executed by Fulmer under the terms of which the latter offered to convey certain real estate and pay the sum of $40,000.00 for "Mimosa" and with additional provisions as contained in the later contract or offer, as will be hereafter noted. Hammond received this offer but made no response, testifying that he ignored it.

Shortly thereafter Complainant Hood, Sr. called Hammond with respect to the offer of Fulmer and learned that the same was not acceptable, but in this same conversation further discussion was had with respect to the price at which the property would be offered and an agreement reached upon the figure of $67,500.00, Hammond claiming that this was the figure which would be recommended to his wife, Hood insisting that Hammond agreed to accept this amount in cash without any qualifying statement.

Complainant Hood gained Mr. Fulmer's consent to pay this price and immediately dispatched the telegram, as above set forth, and also mailed him copies of contracts as signed by Fulmer, all directed to Hammond's Wyoming adress. Colonel Hammond testified that he was in the act of leaving his home for a trip at the time the telegram was received at the nearest telegraph office, a distance of several miles, and an effort made to transmit the contents of the wire to him by a rural telephone but the conditions were such that he could not and did not ascertain the contents of the wire but did understand enough thereof to comprehend that it contained something about Fulmer. He made no effort to obtain the full contents of this telegram and further testified that it was never mailed or otherwise delivered to him. Upon returning to his ranch several days later he found the copies of the proposed contract and immediately called Complainant Hood with respect thereto.

The nature of this conversation and the conclusions reached thereby by the participants is very sharply in dispute. Mr. Hood testified that Colonel Hammond inquired if he, Hood, thought $1,000.00 was sufficient earnest money and was given assurance that it was, and then requested that no publicity be given to the sale; and then stated that "everything was all right, to go ahead", and gave instructions for him to proceed to have the abstract brought up to date and get ready to close the sale, and that in compliance with such instructions he did have the abstract brought up to date, but heard nothing further until he learned that the property had been sold to another. On the other hand Colonel Hammond testified that he in this conversation advised Mr. Hood there were three reasons why he could not submit

the contract to Mr. Hammond; namely, first, that he did not think $1000.00 was adequate earnest money; second, that there was a mortgage indebtedness on the place not then due, the payment of which the mortgagor would not then accept; and third, that the provision with respect to giving possession with the deed was absolutely impossible as they had no place to move. That he heard nothing from Mr. Hood, and upon his return to Memphis a short time later found that his wife had under way another transaction for the sale or exchange of said property with an entirely different party and that he entered into the negotiations and assisted in the consummation of this deal, and without any further negotiations with complainants or their prospective purchaser Fulmer.

It is insisted on behalf of complainants that since a contract had been submitted to Colonel Hammond for an exchange of property with the prospective purchaser Fulmer, which contract proposed similar terms to those which were contained in the latter contract submitted in connection with the proposed sale to Fulmer at $67,500.00 cash that defendants, upon the doctrine of estoppel, were bound thereby. In other words, that since the first or prior written offer submitted to defendants contained certain stipulations other than the amount of the consideration, that when an agreement as to the cash consideration was reached by phone that defendants would be further bound by all the other stipulations embodied in the prior offer. While these facts may well be considered along with other attending circumstances in determining the good faith or lack of good faith of defendants, yet the mere submission of an offer specifying a certain consideration with other stipulations, which

proposal was not acceptable to the offeree, would not warrant the assumption that the offeree was agreeable to all the terms thereof except the consideration. Petway v. Loew's Nashville & Knoxville Corporation, 22 Tenn. App. 59, 117 S. W. 2d 975; Canton Cotton Mills v. Bowman Overall Co., 149 Tenn. 18, 257 S. W. 398; Coate v. Tigrett, 4 Tenn. App. 48.

It is a recognized principle that not only the price but also the terms of the contract must be agreeable to the seller, and he alone has the right to fix the terms. However, the jury has settled the proposition that complainants produced a purchaser "at the authorized price of $67,500.00 cash for the property". And even if it be assumed that the provisions in the proposed written contract relative to the term of delivery of possession, etc. were matters or details material to defendants, yet when an agreement had been reached as to the price and terms of payment with one able and willing to purchase then in good faith, under which all must be assumed to have been acting, would dictate that the parties undertake to compose any differences as to the exact time when the cash would be paid, delivery of possession would be made, and the like. Manifestly in every real estate transaction there are matters which are incident to the sale and exchange of title. The adjustment of such details is usually attended with no serious difficulty where the seller is willing to sell and the offeror willing to buy. The language of the Court in the case of Chambers v. Percefull, 28 Tenn. App. 517, 191 S. W. 2d 568, 569, is quite appropriate:

" . . . In the present state of this record it is conclusively shown without contradiction that the complainant was the procuring agent who brought these parties

together and secured a purchaser at a price acceptable to the seller.

"Under these facts as heretofore detailed we think the complainant was certainly entitled to a reasonable time within which to complete the contract. A seller should not be allowed to escape liability to the broker for his reasonable compensation by entering into a contract with another when the seller has knowledge of the broker's actions and promises him she will accept the fruits of his labors.

" 'In line with this view, it is held that the principal cannot defeat the broker's right to compensation by revoking his authority in the midst of negotiations, at least where there is strong likelihood of the negotiations being successful. Certainly commissions are due where, pending negotiations, the owner fraudulently or in bad faith revokes the agency and closes the deal with the person negotiated with by the broker. Although, according to other authorities, the principal may revoke the broker's authority while negotiations by the latter with a prospective purchaser are still in progress, provided he does so in good faith, nevertheless, where the broker's agency to sell is terminated on the eve of its successful culmination, the time of revocation is a strong indication of bad faith on the part of the owner, and unless the inference is rebutted by evidence the owner will be held liable for commissions.' 12 C. J. S., Brokers, Section 66, subsec. c, page 154."

Perhaps any court would be slow to impose liability upon a seller for a broker's commission who, upon the exercise of reasonable effort, was unable to reach an agreement upon the incidental matters pertaining to the sale and transfer of title to real estate. But where a principal accepts the services of an agent it is

only reasonable to assume that he will cooperate normally and in good faith in accomplishing the purposes of the agency.

"Since an agency is essentially a contractual and consensual relationship, the duties and liabilities of the principal are primarily based upon the contract and the validity of the contract between them. In addition to his contractual duties, the principal is under an obligation to deal fairly and in good faith with his agent." 3 C. J. S., Agency, Section 174, pages. 63-64.

"Where an agent undertakes merely to produce a person who is able, ready, and willing to enter into a specified transaction with the principal on the terms prescribed by the latter, the production of such person generally entitles the agent to the contract compensation, although the principal fails or refuses to enter into the transaction in question, or although the third person fails or refuses to complete the transaction on account of some default by the principal; and the agent is all the more entitled to the stipulated compensation if he procures a contract from a third person binding him to accept the principal's offer." 2 C. J. 769, Sec. 437; 3 C. J. S., Agency, Section 178.

"Where the agent has performed on his part all acts necessary to the performance of the contingencies or conditions, or to the accomplishment of the contemplated result, he cannot as a general rule, be deprived of his right to compensation by the refusal of the principal to perform necessary acts on his part, whereby the contingency or contemplated result is defeated." 2 C. J. 768, Sec. 436 (b) C. J. S., Agency, Sec. 186.

Aside from the fact that the record leaves much doubt as to whether any further terms than $67,500.00

cash was discussed between the brokers and Colonel Hammond at the time the terms were finally considered, it is apparent that no effort was made by defendants to compose the differences on the incidental matters, if any there were. Defendants' brokers having produced an acceptable purchaser who was ready, able and willing to purchase at the price authorized by defendants, then before the owner could be excused from liability for a commission for the service rendered it would be incumbent upon her to establish that upon the exercise of a reasonable effort or at least an ordinary and reasonable attitude that the trade could not be consummated. This defendants have not shown. Notwithstanding the fact that the transaction was manifestly so near completion, yet defendants apparently made no serious or strenuous objection to the terms. And, if certain terms were objectionable, they did not indicate the terms which would be acceptable. While they both returned to Memphis and engaged in a transaction which culminated in a sale or exchange of their real property, yet neither made any further contact with complainants and all prior negotiations were ignored. Under these circumstances the conclusion is inescapable that complainants had fulfilled their duty as brokers to the point where they were entitled to their commission.

It results, therefore, that the judgment of the lower Court as against defendant, James Thomas Hammond, is reversed and the cause as to him dismissed, and the judgment as to defendant, Beatrice R. Hammond, is affirmed. Said defendant, Mrs. Beatrice R. Hammond will also pay the costs of the cause, including the costs of appeal.

ANDERSON, P. J., and SWEPSTON, J., concur.