ELMER JOHNSON v. LAMAR GRAVES et al.

Western Section.   April 27, 1932.

Petition for Certiorari denied by Supreme Court, January 21, 1933.

Ewing, King & King and Caruthers Ewing, Jr., all of Memphis, for appellee.

L. H. Graves, Hugh Magevney, Jere Horne and Bates, Shea & Frazer, all of Memphis, for appellant.

OWEN, J. The complainant's bill was sustained in the lower Court, and the defendants have appealed. The complainant is a negro woman, about fifty years of age. She alleged that she and Henry Johnson, deceased, had lived together for more than twenty years prior to Henry Johnson's death, which occurred December 24, 1928. The complainant alleged that she and the deceased had held themselves out as man and wife, and that twenty years prior to Henry's death she and the deceased had entered into an oral partnership agreement, that they had combined their labors and money into a common fund. She alleged that the partnership business consisted of the running of a rooming house by the complainant and the operating of a barber shop in the same building by the deceased.

It appears that the deceased in about the year 1909 rented a three-story building at 203 Beale Street, Memphis, Tennessee. The first or ground floor was used for a barber shop. The complainant and the deceased occupied the second floor as their living quarters. There were three rooms on the third floor, which the complainant rented to various occupants. The defendants are Dr. Lamar Graves, the Administrator of Henry Johnson's estate, Frances R. Johnson, the widow of Henry Johnson, and Ann Ward, a sister of Henry Johnson.

It appears that Frances R. Johnson lived in Crittenden County, Arkansas. The other two defendants are residents of Shelby County, Tennessee.

The defendants filed demurrers to complainant's bill which were overruled, with permission to rely upon the grounds thereof in their answer.

The defenses made were that complainant was a married woman and incapable of entering into a valid contract, under the laws then in force in the State of Tennessee.

(2)   The alleged contract of partnership arose out of or was connected with the illicit cohabitation of complainant with the deceased, Henry Johnson, and it was against public policy and, therefore, void.

(3)   The alleged contract of partnership was in derogation of the Statute of Frauds, and that complainant was claiming the right of ownership in real estate by virtue of a verbal contract.

The answer, also, averred that, following the decedent's death, for something over a year the complainant, without attempting to rely upon any alleged contract of partnership and not claiming that such existed, set up the following various and conflicting claims to the estate of Henry Johnson, deceased, in the order named, each claim being abandoned by reason of some legal defect therein before the succeeding one was advanced.

(a)   That she could and would set up a nuncupative will.

(b)   That she was entitled to recover against his estate for services rendered to deceased on a *quantum meruit* basis.

(c)   That she was the wife by estoppel of Henry Johnson, deceased, and entitled to share in his estate by reason thereof.

The defendants alleged that the last said claim was abandoned only when it was brought to complainant's attention that she had a living husband, and under no circumstances could have been the wife of Henry Johnson by estoppel or otherwise.

Upon abandonment of said last mentioned claim, suit was thereupon brought upon the alleged contract of partnership and alleged promise to make a will. ·

The cause was tried before a jury in the Chancery Court.

It appears that the case has been submitted to two juries. The verdict rendered by the first jury was set aside and a new trial granted. The Court directed the jury to return a verdict in favor of the defendants so far as complainant's claim to any real estate was concerned.

The following issues and the answers thereto were submitted to the jury, and answered as herein stated:

(1)

State whether or not complainant and Henry Johnson entered into an oral partnership for the purpose of renting a building and operating a rooming house and a barber shop therein, pooling the earnings thereof and investing the profits, and upon the death of either; the survivor to own the partnership assets?

Answer:  Yes.

If you answer the first issue in the affirmative, then answer the following questions:

(a)   Give the approximate date of the formation of such partnership?

Answer:  1914.  .

(b) State whether the consideration for such partnership agreement was based wholly, or in part, upon illicit cohabitation between the partners.

Answer: No.

A large number of witnesses testified for the complainant and the defendants. Upon the return of the jury's verdict there was a motion for a new trial which was overruled. The motion for a directed verdict was overruled prior to the Court's charge to the jury. There was a decree to sustain complainant's bill, and complainant was given a decree against the administrator for $6,463.21, the same being her share of the partnership funds, less administration expenses, which was fixed at $5,721.11. The defendant, Graves, Administrator, was ordered to deliver to the complainant one-half of the barber shop equipment and household furniture, which he took into his possession free from any lien for storage. The complainant and the defendants were taxed one-half each with the costs.

The defendants excepted, prayed and perfected an appeal. They had signed and filed a proper bill of exceptions, and have assigned thirty-five errors. These errors will be grouped into three groups. And by the first group which included assignments number 1 to 9 inclusive and assignments 31, 33 and 35; all deal with the alleged errors of the Court in failing to sustain plea in abatement filed by the administrator and the demurrers of the defendants, and that there is no material or legal evidence to support the verdict of the jury that a partnership existed between the complainant and the deceased, and that the Court should have directed a verdict in favor of the defendants, on the ground that the contract of partnership, if any existed, was tainted by the illicit cohabitation between the parties, and in withdrawing from the consideration of the jury the question of whether the consideration for the partnership agreement, if one existed, was based wholly, or in part, upon illicit cohabitation.

Group number two, which includes assignments 10, 14 and 19, are objections to the testimony of various witnesses who related conversations or statements made by the deceased in which he stated that the complainant was his partner or was interested in the business conducted by complainant. It is insisted that none of the statements related by the witnesses were against the pecuniary interest of the deceased.

By the third group of assignments, which includes assignments 25, 26, 27 and 28, deal with appellant's contention that the proof does not show that any part of the funds in the hands of the administrator were partnership assets, or belonged to complainant by virtue of any resulting trust, or otherwise.

The facts necessary to relate surrounding the lives of the complainant and the deceased, Henry Johnson, as reflected from the record, are as follows:

Henry Johnson, colored, was reared at Oceola, Arkansas. He came to Memphis in 1902. He was a barber. He had just about reached his majority when he came to Memphis. It appears that Henry's father was a prosperous farmer in Mississippi County, Arkansas. He rented and conducted four farms. Henry had $300 when he came to Memphis, and he entered the employment of McClain Ross, colored, who operated a barber shop with six chairs in the Beale Street Market House of Memphis. McClain Ross died May 3, 1908. Henry Johnson had been working for Ross at the time of Ross' death for several years. Ross' widow sold the barber shop equipment of her deceased husband to Henry Johnson soon after Ross' death, for $100. Henry operated the shop in the Market House for some time and moved to 203 Beale Street where he continued to operate a barber shop until his death, December 24, 1928.

The jury, in its verdict, stated that the contract between complainant and defendant began in 1914. Ross' widow testified that Henry Johnson moved from the Market House to where he died in 1909. The complainant was the wife of one, Mitchell Scruggs. She married Scruggs in 1906, left him in 1907. Scruggs filed a divorce bill April 30, 1913, against the complainant, and alleged that she was living in adultery with Henry Johnson, at 203 Beale Street. This divorce bill was dismissed July 3, 1914, because the complainant failed to appear and prosecute his suit. The deceased, Henry Johnson, married the defendant, Frances Robinson Johnson, in Crittenden County, Arkansas, January 30, 1926, two years and eleven months prior to his death. There is nothing in the record to show that Frances Robinson ever lived in Memphis, or ever came to Memphis. Henry's sister, Ann Ward, lived at Earle, in Crittenden County, Arkansas.

It appears that Henry Johnson purchased four pieces of real estate on the following dates and for the consideration stated after each date:

August 18, 1909, one lot............................$150.00
October 1, 1909, one lot............................. 700.00
July 14, 1910, one lot............................... 125.00
June 25, 1921, one lot............................... 225.00

Each deed recited that the consideration was cash. These four deeds show a consideration of $1200. There is nothing to show what improvements were on the lots or what improvements Henry Johnson made after his purchases. The record infers that Henry was receiving rents from each piece of real estate, and after his death, one of his houses was destroyed, and the administrator collected $808 insurance. The administrator, also, testified that he had collected $500.65 net rents in a period of about twenty-two months after Henry's death. These rents had been collected by a rental agency. The administrator had had the real estate appraised, which appraisal

was $4,930. We infer that this appraisal was made after the insurance of $808 was collected. The barber shop equipment was appraised $1250. The complainant, after the death of Henry Johnson, found a certificate of deposit issued by the First National Bank of Memphis, Tennessee, to Henry Johnson for $13,993.24. Complainant carried this certificate of deposit to her lawyer, Mr. Ed Weinstein. She had been informed that it was some kind of a check. Weinstein turned over the certificate of deposit to the administrator. This certificate was dated September 8, 1928. It showed that $13,520 was principal and $473.24 was interest. How long Henry Johnson had been a depositor in said bank doesn't appear, and there is no proof in the record as to how Henry Johnson came in possession of the $13,520 on September 10, 1928.

It appears that attorney Ed Weinstein was representing the complainant, and he was negotiating a compromise settlement with the administrator for services rendered by the complainant to the defendant. The administrator, through his attorneys, had agreed to pay the complainant $1000 for her services. Weinstein recommended that the complainant accept this, which proposition she refused. And Weinstein's letter to the complainant "withdrawing from the case and returning her papers, and advising her to get other counsel" was introduced without objection.

Weinstein testified that the complainant was an ignorant illiterate negro woman. She could neither read nor write, and it was hard to understand anything she had in her mind, except that she had a claim. Weinstein testified upon cross-examination by complainant's counsel who waived any privilege or confidential relation between the witness and the complainant. He was asked this question by complainant's counsel.

"Q. Had it been presented to you that she had loaned money to Henry Johnson to start in business, with, and that he had repeatedly told her and made an oral agreement, and they understood they were working on a fifty-fifty basis, would you not then have advanced the partnership claim, and not these other claims that you did advance?

The witness answered that no such state of facts was ever put to him.

Mr. Weinstein had associated with his firm of Galloway & Weinstein, the law firm of Wilson, Gates & Armstrong, and they had proceeded to represent the complainant on the theory that the deceased had held complainant out as his wife, and, therefore, the deceased or his administrator was estopped. And on the further grounds that if they couldn't establish the relation of husband and wife, then the complainant was entitled to recover for her services rendered six years prior to Henry Johnson's death. Mr. Weinstein, also, stated on cross-examination that the complainant was claiming that she was entitled to Henry's estate under a nuncupative will. But this theory

of a nuncupative will had to be abandoned, because the alleged will had not been reduced to writing within the time required by law.

Mr. Weinstein, no doubt, amused the Court and jury by relating the circumstance surrounding complainant's delivery to the witness or attorney of the certificate of deposit, and we quote from his testimony as follows:

"I might state when she brought it up there it was all folded up, and it looked dirty. She said, 'I was looking through some papers down there, and I found this, and I don't know what it is.' She said, 'somebody said it was a check.' I unwadded the thing there, and it was all dirty, and, my recollection is—I think that was a time deposit for eight or ten thousand dollars.

"Q. To refresh your recollection, wasn't it in the neighborhood of fourteen thousand dollars? A. I don't remember. I know I like to fell dead when she handed it to me. I didn't know I was going to have to turn it over to Mr. Lamar Graves.'"

The complainant in support of her allegation that she was a partner with the deceased, Henry Johnson, examined a number of colored men who had worked for the deceased as barbers, and we quote the substance of their testimony.

Ed Higgenbotham testified that he heard the deceased say that the complainant gave the deceased his start in business. The deceased said that this woman he was living with started him out in business and loaned him the money.

R. B. Storey testified that the deceased stated that what money he had belonged to deceased and complainant, that the deceased said, "She hoped make everything he had." This witness further testified that the complainant ran a rooming house over the barber shop, and did laundry work for the barber shop, and stated that when the barber shop was without a porter the complainant did clean up the shop.

Some of these barbers occupied rooms in the rooming house conducted by the complainant, and they paid from $2.50 to $3 per week.

C. W. Graham, who appeared that he was both spiritual and legal adviser for complainant several times, testified that at one time Henry Johnson deeded certain property to the witness with instructions to deed the property to the complainant in case of Henry's death, while the property was in the name of the witness. This witness testified that the deceased said that the complainant had made him, and that the deceased wanted to make a will leaving her everything. This last statement was admitted alone as bearing on the existence or nonexistence of a common interest in the property by reason of a partnership.

Harry Brown testified that he conducted a pressing shop in the same building where deceased's barber shop was. This witness further

testified that on one Sunday morning he and the deceased were in the barber shop, and deceased had about $350 counting it out to go to the bank. "I had a little money that I was supposed to put in the bank, about $100. He said, "Well, Brown, you got a pretty good roll, but you ought to have a roll like that." I said, "You have got a better business, you have got a barber shop—make twice what I make there in the rear." He said, 'All this money is not mine; one-half belongs to Elmer.' He said 'Elmer is making practically as much off the rooming house as I make off the barber shop.' I said 'You and Elmer must be in partnership.' He laughed and said, 'I will tell you this: Elmer has caused to me to have this business in the shape I have got it.' And he says 'At my death, if she shall be the longest liver, I intend for her to have everything I leave.' He said, 'I strictly run this business on a partnership basis.'

L. R. Ankton rented space in deceased's barber shop and occupied the same, rented from 1918 to 1928. This witness testified that the deceased introduced complainant as his wife when the witness first went to 203 Beale Street. The witness further testified that the deceased upon relating to witness how he came by his business, the deceased said that the complainant placed him in business, that she started him in business. The witness was asked if he ever heard the deceased say that the deceased and complainant were working under a partnership arrangement. The witness answered, "I did."

Practically all of complainant's witnesses fixed the dates of the statements made by the deceased at about 1918 and 1920.

Thus we have these nine colored witnesses testifying, not all of them to the same state of fact, but in substance, the following:

(1) That the deceased had said, "that complainant gave the deceased his start in business, and loaned him money."

(2) That the deceased had said, that complainant had helped him make what he had.

(3) Storey and Brown testified that the deceased had said, what he had belonged to deceased and complainant.

(4) Five of the witnesses testified that they had seen complainant, on different occasions, turn over money to the deceased.

(5) Four of these witnesses testified that the deceased had said, "that if compainant lived the longest, deceased desired that his property go to her."

(6) Two witnesses testified that the deceased had said "that he and complainant were on a partnership basis."

It further appears that during the year 1925 or 1926, the complainant and the deceased had some differences in their affairs. She sought the services of lawyer B. F. Booth, colored. The defendant sought the services of lawyer Bomar, colored. It appears that lawyer Bomar died prior to the death of Henry Johnson. This friction be-

tween the complainant and the deceased did not last long, and they resumed their former relations.

It appears that the deceased married Frances Robinson January 30, 1926. The license issued by the proper official of Crittenden County, Arkansas, states that at the time of the marriage the deceased was forty-five years of age; Frances Robinson thirty. We are of the opinion that while Henry married in Crittenden County, which is just across the river from Memphis. The record fails to show that his wife, Frances Robinson, ever came to Memphis, evidently, the marriage of Henry started the threatened lawsuit between the complainant and Henry Johnson, which in a short time was adjusted. How it was adjusted and on what terms, we do not know. But the record shows that the complainant and the deceased resumed their relations and lived on occupying the same rooms as they had for many years prior to the threatened breach.

Some six years prior to Henry Johnson's marriage to the defendant, Frances Robinson, he procured an insurance policy, and in the application for the insurance, it was made payable to Henry's brother, Frank Johnson, who evidently had died prior to the death of Henry Johnson. In this application for insurance, the deceased stated that he was the proprietor of a barber shop, that his monthly income was $150. About the same information was shown by other applications made to different insurance companies, at different times.

Mr. Ceylon B. Frazer, one of the attorneys for Frances Robinson Johnson, the widow of Henry Johnson, testified that he made an examination of Henry Johnson's effects, that he found certain deeds, three insurance policies, but found no books or records of any character showing that the complainant had any interest in the business conducted by the deceased. The witness testified that he had made a close examination. He found no papers or any records which showed how the certificate of deposit in the First National Bank was acquired. There was nothing that showed how this certificate of deposit was obtained or how it got into the First National Bank. No insurance policy was payable to the complainant.

The deceased rented the building in which the barber shop and rooming house was conducted from one F. T. Cuneo. Cuneo testified that the deceased paid his rent promptly on or about the first day of each month, that he rented the building by the month, that the deceased always paid the rent in cash, from his pocket. The witness did not tell how much the deceased paid per month, and the witness stated that he didn't keep any record of his collections. He knew that he always got his rent promptly about the first of each month, and got it in cash and never by check.

As to the first assignment of error, we are of the opinion that the Chancellor was not in error in overruling the plea in abatement.

Section 4240 of Shannon's Code gives a married woman the rights of a feme sole when she leaves her husband by reason of his violent or ill treatment toward her. Cockrell v. Wiley, Admr., 51 Tenn., 474; Yeatman, Shields & Co. v. Bellman, 74 Tenn., 488.

The record shows that complainant's husband had knocked out her teeth and she was forced to withdraw from Scruggs, her husband.

As to the group of assignments going to the sufficiency of the evidence, it is well settled in law that issues of fact in Chancery, made upon demand of either party, are tried by the jury, according to the forms of a Court of law, and such trials are conducted as .are jury trials at law, and the findings of the jury have the same force and effect as in a trial at law. Shannon's Code, Sections 4888 and 6286.

This Court looks only to the verdict of the jury on the material issues. Wright v. Jackson Const. Co., 138 Tenn., 145, 196 S. W. 488.

This Court looks to the sole question of whether or not there is any material evidence to sustain the verdict of the jury, in determining whether or not there is such evidence, the strongest legitimate view of the testimony against the losing party is, by this Court taken as true. Meyer v. Cooper, 6 Tenn. App., 38; Railroad v. House, 96 Tenn., 552, 35 S. W., 561; Citizens Rapid Transit Co. v. Seagrist, 96 Tenn., 120, 33 S. W., 920; Kirkpatrick v. Jenkins, 96 Tenn., 85, 33 S. W., 819.

If there is any material evidence to sustain the verdict of the jury its verdict is conclusive. Meyer v. Cooper, supra; Scruggs v. Heiskell, 95 Tenn., 456, 32 S. W.. 386; McCeya v. Hill, 105 Tenn., 319, 59 S. W., 1025.

The defendants insist that none of the indicia of partnerships are shown by the record to exist. There was lacking the following material elements:

(a) No partnership name.
(b) No partnership funds.
(c) No partnership accounts.
(d) No partnership letterheads.
(e) No partnership bank account.
(f) No co-mingling of funds.
(g) No co-mingling of property.
(h) No writing, or certificate, or memorandum of partnership.
(i) No agreement as to profits.
(j) No agreement as to losses.
(k) No time fixed for expiration of the partnership.

It is not necessary to have a partnership name at common law. Certain states require by statute the name of a partnership. "Copartnership name exists though there be no firm name." Meriden National Bank v. Galdaulet, 120 N. Y., 298, 24 N. E., 994, 47 Corpus Juris, 736.

As to all these questions raised, we realize that the evidence as to a partnership between the complainant and the deceased is very weak and unsatisfactory, however, the jury, the weighers of evidence, heard all the evidence, heard the statements of the witnesses who testified that Johnson and complainant were operating the rooming house and barber shop on a partnership basis.

As to the weight of such evidence, 2 Jones on Evidence (2 Ed.), sec. 916, says:

"With respect to such admissions generally it has been well said that courts of justice lend a very unwilling ear to statements of what dead men have said, and that evidence of admissions and declarations is not, as a rule, the most satisfactory; verbal statements are liable to be misstated or distorted, and the actual statements of deceased persons are liable to abuse."

"Courts of justice lend a very unwilling ear to statements of what dead men have said." Lea v. Polk Copper Company, 21 Howard, U. S., 504.

Parol declarations of an alleged partner are admissible as against him in proof of the existence of a partnership, even though made to others than the complainant. McMurray v. Arcady Farmers Milling Co., 6 Tenn. App., 289, in which petition for Certiorari denied by Supreme Court; 47 Corpus Juris, 721; 20 R. C. L., 847; Rowley on Partnership, Sec. 891; Lindley on Partnership, 114.

The declarations of a deceased person against his interest are admissible in Tennessee. Overton v. Hardin, 46 Tenn., 365; Railroad v. McMillan, 134 Tenn., 490, 184 S. W., 20.

A contract is not within the Statute of Frauds simply because it is oral and of indefinite duration, and this applies equally to a contract of partnership. 47 Corpus Juris, 649; 27 Corpus Juris, 190, 220; 20 R. C. L., 811-812; Rowley on Partnership, Sec. 212; Railroad Co. v. Staub, 75 Tenn., 398; Linan v. Smart, 30 Tenn., 310; Denton v. Coal Co., 59 Tenn., 653.

"The fact that the relation between the parties is one of concubinage or bigamy has been held not to prevent recovery by one partner as such, from the other or of money or property due." 47 Corpus Juris, 653.

The record shows that the complainant rendered valuable services in the running of the rooming house and barber shop for a period of many years. She washed towels for the barber shop, scrubbed the floors, and looked after the rooms that were rented to roomers. It appears that she had operated a barbecue stand on Beale Street prior to entering into contract with the deceased, and that she loaned the deceased some money with which to purchase the barber shop equipment from the widow of McClain Ross, which investment was $100. Henry Johnson had stated that he owed his start in business to the

complainant, and we are of the opinion that he wanted to reward her in some way, or repay her, as he had stated several times that he wanted the complainant to have his property if she outlived him. Of course, his estate is not bound by such an expressed wish or statement.

The complainant, in her bill, alleges that the barber shop equipment left by the deceased was of the value of approximately $2000. There is nothing in the proceedings or in the proof as to what the furniture in the other two stories of the three-story building at 203 Beale Street, is worth. As the complainant rented rooms furnished, we know that something was spent in furnishing the second and third stories of this building. The Administrator states that the barber shop equipment is worth $1250, so apparently Johnson spent quite a bit of money in increasing the value of his barber shop equipment which he purchased in 1909, for $100.

We are of the opinion that there is evidence to support the jury's verdict, that the complainant had an interest in the barber shop equipment and the furniture in the rooming house.

"In the absence of an agreement, partners share profits and losses equally." Lavori v. Carey, 251 Mass., 124, 146 N. E., 241.

This brings us to the question of whether or not there is any evidence to support the jury's finding, that the complainant is entitled to share in the deposit made by the deceased in the First National Bank. In other words did the deceased hold said deposit in trust as a partner for the partnership of himself and complainant, and is there a resulting trust in said deposit in favor of complainant. The jury's answer on this issue is based on the statements of five witnesses, men who had been associated with the complainant and the deceased, and that they had seen the complainant give the deceased money at different times.

The witness, Richard Hobson, testified as follows:

I happened to be there on Saturday night around 12:00 or 1:00 o'clock, and he would come upstairs from down there you know his barber shop was under the building and she was upstairs. He would come up, a time or two and ask her was she ready to put her money in with his. He said, "Are you ready to put yours in—count yours?" She said, "Yes." They went in and went to counting money. It seems it would be around $25 or $30 and maybe sometimes less and sometimes more.

"Q. That was at the end of the week? A. Yes, sir; that was at the end of the week; and sometimes it would be more than that."

This witness further testified that he hadn't heard anything said about a partnership, but that he had heard the deceased say that he wanted the complainant to have what he had left, because she was the one that gave him his start in business. This witness testified that he rented a room from the complainant, and paid her $3 a week.

The witness, Will Higgenbotham, testified that he had worked for the deceased for twelve years, prior to deceased's death. Later he testified that he started working for the deceased in 1920 and worked until the deceased died, that he had seen the complainant come down stairs and bring the deceased money from upstairs, and turn it over to the deceased. He couldn't say how many times she had brought money down stairs, but a good many times. He did not know where she got it, but that she did bring it down and give it to deceased as though he were keeping it for her.

Willie Williamson, a barber who had worked for the deceased from 1920 until deceased's death, testified that all he ever heard or saw during the time he was employed by the deceased was, that deceased told him that complainant ran the rooming house and deceased ran the barber shop.

This witness was asked the following questions:

"Q. Did you ever hear him state that they were working in a partnership agreement? A. No, sir.

"Q. Have you ever seen Elmer (complainant) turn over money to Henry? A. Yes, sir.

"Q. On many, or few, occasions? A. On all occasions.

"Q. Do you know where she got that money from? A. No, sir."

The witness, L. R. Ankton, the watchmaker, rented a part of the barber shop, and was in business at 203 Beale Street, in deceased's barber shop from 1918 to 1928. This witness roomed at 203 Beale Street. He testified that on many occasions he had seen the complainant turn over money to the deceased. The deceased never did state to this witness that the deceased and complainant were partners.

On cross-examination, this witness testified that the money that he saw complainant give Johnson might have been money belonging to Johnson, kept in his rooming house.

The witness, R. B. Storey, a barber, who had worked for the deceased and who knew the deceased from 1920 until the deceased's death, testified that he heard the deceased state that what money he had belonged to him and her, and she "hoped" him make every dime he had. He was asked the following questions and make the following answers:

"Q. Storey, I will ask you whether or not you ever saw her turn over money to Henry Johnson? A. All the time. All the money she made on that house she turned that over to him.

"Q. Do you know what that would average? A. They had seven or eight rooms up there, and she had them all full, practically, when I was living there.

"Q. Do you know what they paid for them? A. Yes, sir. I know. I had one of them—$3.50 a week, is what I paid."

These five witnesses testified as to the complainant giving money to the deceased, probably, over a period of ten years. Whether they were all witnesses to the same transaction, or whether they were different transactions or payments of money viewed by the witnesses at different times is not clear. Whether it was money belonging to the deceased and the complainant was keeping it for him until he called for it, some of the witnesses did not know. There is no connection between any money that the complainant turned over to the deceased and the deposit in the First National Bank. There is no proof that the partnership made any profits outside of the increased value of the barber shop equipment so far as the record shows. Johnson owed no debts at the time of his death, he owned some real estate. The deposit in the First National Bank could have come from the money that his father sent to Johnson, or from his income from the real estate.

The partnership in the rooming house and barber shop had to pay rent, which was paid in cash. It had to pay for fuel, lights, water, laundry. The complainant and the deceased had to live; there were living expenses, food and clothing. There is nothing to show but what the complainant and deceased divided their income. We find no partnership funds, no partnership accounts, no partnership bank account. There is no evidence that the funds of the partnership were ever co-mingled with the individual property of the deceased. There is no evidence as to profits, no evidence as to any losses. The fact that this bank account or certificate of deposit stood in the name of Henry Johnson is prima facie evidence that it belonged to his estate. Getty v. Long (Md.), 33 Atl., 639.

23 Corpus Juris, Section 369. page 1157, is as follows:

"It is a presumption of law that personal property of all kinds found in a person's possession or under his dominion and control at the time of his death belongs to him, and constitutes assets of his estate, especially if he had had possession for a long time under circumstances favorable to strengthening his title; and it devolves upon anyone claiming any of the property adversely to establish his title."

In Maupin v. Daniel, 3 Cooper's Tenn., Chancery Reports, 227, the following was laid down as the rule in regard to partnership accounts.

"In order to take a partnership account, there must first be a general account, ascertaining the profit or loss, as the case may be, and then separate accounts between each of the partners and the firm, showing how the profit or loss is to be shared. Hicks v. Chadwell, 1 Tenn. Ch., 251. The individual account is impossible until the general account has been taken; for, until we know whether there has been a profit or loss, we cannot tell whether there is anything to divide. The business may have sunk the whole capital put into it,

and the individual property of the partners besides. It would be useless to state that the complainant put in $10 at one time, $25 at another, a box of soap here, and a load of lumber there, unless we have data for the general partnership account. The complainant is content to show his side of the account in the way of advances; but neither in his bill nor in his deposition does he give us any facts touching the terms of the partnership, the advances of the defendant, the time during which the business was carried on, nor the details of that business. The defendant gives him no help in his deposition, for he denies the partnership altogether. The boarding-house belonged to defendant, and he must have contributed something, both in labor and supplies, if not money. The boarders, from whom two or three thousand dollars were realized, must have been fed on something more than what the defendant supplied, to-wit, a sack of coffee, a sack of sugar, a sack of apples, and twelve bushels of meal—a modicum of bread to an "intolerable deal of sack." I am constrained to concur with the clerk in his conclusion that the evidence is not sufficient to enable him to state a partnership account."

"The doctrine as to the tracing of funds to establish a resulting trust in either real or personal property, is the same." Vigne v. Vigne (N. J.), 130 Atl., 816.

The Chancellor, in approving the verdict of the jury and in holding that the complainant was entitled to share in the certificate of deposit, was of the opinion that the deceased had co-mingled partnership funds with his own funds. That would have been a proper ruling if there had been any proof that Johnson, the deceased, had deposited any of the partnership funds or any funds in which the complainant had an interest in the First National Bank. No one ever saw Johnson go in a bank or carry any money to the bank. There is no connection between the testimony of the witnesses who saw the complainant hand Johnson some money and the certificate of deposit. There is no proof that the partnership had any assets in 1928, other than the barber shop equipment and the furnishings of the rooming house.

"As a general rule the law will not presume a resulting trust except in a case of necessity, and the burden of establishing such a trust as against the holder of the legal title, is on the party who asserts it. In case of a resulting trust arising from payment of the purchase price by one person and conveyance to another, the burden of proof, in the first instance, is on the party claiming the trust, to prove that the purchase was made with money or assets furnished by or belonging to him, and if it has been only a part payment, to prove the precise amount so used, as well as the total consideration." 39 Cyc., 152.

It can be unquestioned that in setting up a parol trust, the party seeking to set up must show that his funds were used in the pur-

chase or the building of property in which it is sought to set up the parol resulting trust. Millard v. Hathaway, 27 Calif., 119; Denver First National Bank v. Campbell (Colo.), 30 Pac. 357; Kemper v. Mette (Ill.), 88 N. E., 218; Webb v. Webb (Iowa), 104 N. W., 438; Jones v. Hughey (S. C.), 24 S. E., 178; Cottonwood Bank v. Case (S. D.), 125 N. W., 298; Graham v. Selbie (S. C.), 67 N. W., 831.

In the instant case, there is another fact to be considered, and that is in about 1926, some dispute arose between the complainant and the deceased; each one obtained a lawyer, and matters were satisfactorily arranged, and the two partners, complainant and deceased, resumed their relations in peace and harmony. The presumption is that the dispute was adjusted to the satisfaction of both parties at that time. Now we have a lawsuit where death has closed the mouth of one party to the agreement, and the law has closed the mouth of the other. As was said in the case of McCallum v. Pickens, 213 N. Y. Supp. 119, a recent decision in that Court in a case similar to the facts of this case, wherein the plaintiff was undertaking to prove a promise against the defendants representing the deceased. The Court said:

"The Courts recognize the danger which lurks in contracts of this nature, which summarily dispose of one's estate. They are easy to fabricate, and must be clearly established. While it is not essential that they be in writing, nevertheless when an oral contract is sought to be enforced, the tryers of the facts are required to carefully scrutinize and weigh the evidence, and should be satisfied of its existence by clear and convincing proof." "Evidence of admissions of a dead man has always been considered weak and unreliable, and should be acted upon with caution and be scrutinized with care before it is made the basis of establishing the existence of a contract by the decedent."

This Court is of the opinion that there is no evidence on which a verdict and judgment can be based either on the allegation of partnership, or upon the claim of a resulting trust, that shows and establishes the fact that the complainant is entitled to any part of the deposit made in the name of the deceased in the First National Bank, which deposit bears date of September 10, 1928. Before the burden would be upon the Administrator to explain the deposit and from whence it came, the complainant would have to establish the fact that some of the money, or a part of the certificate of deposit, was hers or that she had an interest therein.

The last group of assignments are sustained, and that portion of the decree of the Chancellor, granting the complainant any recovery in the certificate of deposit, is reversed. The complainant will recover of the defendant, Lamar Graves, Administrator, one-half of the barber shop equipment and household furniture, which he took

into his possession, free from any lien for storage as decreed in the lower Court. The cost of this appeal will be paid; one-half by the complainant and one-half by the defendants. The costs in the lower Court will be paid as decreed by the Chancellor. Complainant's bill is dismissed in so far as any decree was rendered against the Administrator for any part of the certificate of deposit in the First National Bank.

Heiskell and Senter, JJ., concur.