IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
APRIL 22, 2008 Session

## TREZEVANT REALTY CORPORATION v. JOHN E. THRELKELD, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-05-1257-1     Walter L. Evans, Chancellor**

------

**No. W2007-01572-COA-R3-CV - Filed October 14, 2008**

------

This appeal involves a dispute over a real estate sales commission and a third party claim for rent due under a commercial lease agreement. The tenant and the owners of the rental property entered into a listing agreement whereby the tenant's real estate company would broker the sale of the leased property on behalf of the owners. The property in question was two commercial lots. The tenant was able to procure a sale of one of the commercial lots, and upon close of the sale, tenant stopped paying rent to the owners on the remaining commercial lot. Tenant then brought an offer for the sale of the second lot, which the owners rejected and made a counter-offer. No deal was reached, and the owners terminated the tenant's agency authority. Through another real estate agency, the owners sold the remaining lot. The tenant's real estate company brought suit, seeking to collect the real estate commission. The owners sought the rent due on the unsold lot for the time remaining under the lease. The trial court found that the tenant was not entitled to a real estate commission, and that the tenant owed the owners rent, but reduced the amount due to the owner's failure to mitigate damages. We affirm in part and reverse in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., and WALTER C. KURTZ, SR., J., joined.

C. Thomas Cates, Melissa A. Maravich, Memphis, TN, for Appellants

G. Keith Rogers, Jr., Collierville, TN, for Appellees John E. Threlkeld and James E. Threlkeld, Jr.

Linda Jew Mathis, Memphis, TN, for Appellees Elizabeth P. Welch, Waymon H. Welch, and Ginger C. McCullar

# OPINION

## I. FACTS & PROCEDURAL HISTORY

On April 1, 1986, Perkins Interstate Company, LLC ("Perkins" or "Appellant") entered into a 252 month commercial lease with Waymon H. Welch, Sr. and James E. Threlkeld[1] (collectively "Defendants" or "Appellees"), whereby Defendants would lease two commercial lots to Perkins. The lease terminated on March 31, 2007. The leased property, located in Memphis, Tennessee, was referred to as "Lot 3" and "Lot 4."

Perkins, in turn, subleased[2] Lot 3 to Circle K Convenience Stores, Inc.[3] and Lot 4 to Back Yard Burger, Inc. Perkins remained liable to Defendants for the following monthly rental payments on both Lot 3 and Lot 4: for the first forty-two months, $4,000 per month; for the next ninety months, $4,800 per month; for the next sixty months, $5,760 per month; and for the final sixty months, $6,912 per month.

John Trezevant, chief manager of Perkins and president of Trezevant Realty Corporation ("Trezevant Realty" or "Appellant"), discussed with Defendants the possibility of selling Lot 3 and Lot 4. Mr. Trezevant sent Defendants a memorandum on June 29, 2004, which stated:

> Currently we have Circle K and Backyard Burger leasing sites from us as Subleases [sic]. In return, we are basically forwarding those rents to you on a monthly basis. . . .
>
> The neighborhood is not stable and will likely further deteriorate during the ensuing year(s), which would in turn continue to further erode the value of your property. Many area businesses have been closed down, and you can expect more. You obviously know the million square foot Mall of Memphis is closed and all merchants have moved out.

---

[1] Both Mr. Welch and Mr. Threlkeld died, and their heirs acquired the prospective interest in the lease.

[2] The lease permitted the subletting of Lot 3 and Lot 4 as follows: "So long as the Tenant is not in default hereunder, Tenant may by written instrument . . . sublet all or any part of the Demised Premises . . ., but such subletting . . . shall not relieve Tenant from its obligations hereunder[.]"

[3] Technically, the Circle K lot consisted of Lot 3 and a small portion of Lot 4, with the remainder of Lot 4 occupied by Back Yard Burger.

We have slightly more than two years left on our 20-year ground lease with you. The property could have greater value today than it might have next year or the year following that. It was suggested by Jackie [Mr. Waymon Welch, Jr.] that we ask $150,000 for the Backyard Burger site, and he was in agreement with my suggestion that Backyard Burger or its assigns be given the option to purchase their site for a period of time (12-15 months).

Additionally, I have communicated with Circle K and had suggested to Jackie [Mr. Welch] again that now may be a good time to sell this tract of land to Circle K as well. No price was discussed but the tract is approximately 30,000 sq ft.

It is my suggestion that both of these properties be sold as soon as possible. If you agree, come up with your asking price to go to Backyard Burger and Circle K. When they are sold, you would receive the net proceeds and our lease with you would terminate.

On July 15, 2004, Mr. Welch wrote a letter to the Threlkeld Defendants (and copied Mr. Trezevant) voicing his opinion as to the proposed sale of the property:

I think it would be a prudent business decision on your part, as well as my mother's, to sell this property. . . . If you could net $200,000 for the Circle K property and $150,000 for the Backyard Burger property bringing a total of $350,000, I think it would be wise to sell. . . . Again, I suggest you notify John Trezevant with some decision so that he may move forward.

On August 23, 2004, Defendants responded via "authorization" letter to Mr. Trezevant, written by Mr. Welch:

This is authorization for you to proceed with the sale of the Circle K and Back Yard Burger properties located at American Way and Goodlett for a net sales of $350,000.00 to the owners. Any amount in excess of $350,000.00 received from the sale of the property will be paid to you [Mr. Trezevant] in the form of a real estate commission not to exceed ten percent (10%).

I appreciate your effort in this endeavor and hope we can bring this to a closing as soon as possible.

Mr. Trezevant, on behalf of Trezevant Realty, then approached Circle K (Lot 3) and Back Yard Burger (Lot 4) to inquire if they were interested in purchasing the lot each currently subleased.

-3-

Trezevant Realty was able to procure a $350,000 offer from an affiliate of Circle K, Kia Properties, LLC, for the purchase of Lot 3. Defendants accepted the $350,000 offer. The Defendants/Kia sales contract stated that it was "[c]ontingent upon simultaneous cancellation of the Master Ground Lease and Sublease at closing." The sale closed on September 29, 2004, and Defendants signed the following "Lease Termination":

> The foregoing Lease is hereby terminated as of September 29, 2004, by and between Circle K Store, Inc ("Subtenant") . . . . and [Perkins] ("Sublandlord") . . . and [Defendants] ("owners") as to that certain Lease Agreement executed by Sublandlord and Subtenant dated March 23, 1987 . . . relating to the property located at 4317 American Way, Memphis, TN[.]

Perkins ceased making lease and property tax payments when Lot 3 sold on September 29, 2004. Perkins, however, did not obtain a written termination as to the underlying lease between it and Defendants.

Back Yard Burger was not interested in purchasing Lot 4 and thus, Lot 4 remained unsold. Trezevant Realty continued in its attempts to sell the property.

On January 5, 2005, Mr. Trezevant sent Defendants a letter, which read in relevant part:

> I was slightly taken back by our phone conversation yesterday wherein you felt that somehow our Ground Lease was still in effect for the Backyard Burger tract. . . . Said lease had no split or partial payment associated with the Ground Lease. So in order for you, the Lessor, to sell any of the property, the Lessee and Lessor would be required to approve a Lease Termination of my Ground Lease.

On January 12, 2005, Mr. Trezevant presented Defendants with an offer from an individual for the purchase of Lot 4 for $60,000. Defendants made a counter-offer of $75,000 in a letter addressed to Mr. Trezevant, dated January 24, 2005: "I am faxing you a counter offer on the Backyard Burger property at 75,000, with a net commission of any monies negotiated above the selling price of 75,000. Please let [us] know if this is acceptable."

Mr. Trezevant sent Defendants a letter on January 26, 2005, which reads in relevant part:

> Your suggested approach to this transaction is complicating the simple fact that the [Defendants] anticipated getting Three Hundred Fifty Thousand Dollars ($350,000); Two Hundred Thousand Dollars ($200,000) from Circle K, and One Hundred Fifty Thousand ($150,000) from Back Yard Burger. . . .

-4-

Three Hundred Fifty Thousand Dollars ($350,000) was obtained from Circle K alone and now we have the opportunity to get you some additional funds, and at the same time, compensate Trezevant Realty Corporation agents for making two very difficult land sales.

To make matters even more cumbersome, you have delivered a revised contract to me, [ ] changing the Sixty Thousand Dollar ($60,000) offer to Seventy Five Thousand Dollars ($75,000) and then putting in the written statement that any monies received above that amount would go to the broker. <u>What in the heck am I supposed to [do] with this document?</u> Add my commission below it, initial it, and then hand it over to the perspective [sic] buyer with our collective counter? I don't think so!

[Defendants] need to get together, counter the contract, in a legitimate manner wherein you are comfortable with the sales price that in turn compensates my agents and company. . . . It is highly unlikely that [the prospective buyer] will go much over the Sixty Thousand Dollars ($60,000), and again, I suggest you have already received the money sought - net to you. <u>Any balance is ours</u> over that up to Ten Percent (10%) of the total purchase prices. Your action is preventing the agreed compensation due to this company.
. . .

Defendants terminated Trezevant Realty's agency relationship by letter dated February 9, 2005:

This letter is a cancellation of any agency relationship that may exist between [Defendants] and [Trezevant Realty] as of the date of receipt of this letter. The property owners have decided to list it for sale with another realty company.

Please . . . remove your marketing signs from the property as soon as possible. If you will send us a list of the prospects you have dealt with on this property, we will make every effort to register those prospects with the selling agent and ask them to share commissions with your firm should any of your prospects proceed to the purchase of the property.
. . .

Defendants retained another realtor, and on May 3, 2007, Defendants sold Lot 4 for $100,000.

On July 7, 2005, Mr. Trezevant brought suit on behalf of Trezevant Realty, alleging that he was entitled to a sales commission in the amount of $41,000 ($350,000 sale price for Lot 3, plus $60,000 procured price for Lot 4, multiplied by 10 percent).

Defendants filed a third-party complaint against Perkins on August 26, 2005, for the rent allegedly due on Lot 4: "When the sale of Lot 3 closed, Perkins remained obligated to pay the Defendants ground rent of $2,764.80 per month for the thirty (30) month period remaining (October 1, 2004, through March 31, 2007) on Lot 4 of the Ground Lease, for a total remaining rent obligation of $82,944.00."

At the bench trial, the parties stipulated that "Trezevant Realty had procured a Buyer who was ready, able and willing to purchase Lot 4 for the sum of $60,000.00."

Mr. Trezevant testified that in the summer of 2004, Perkins was receiving from the Circle K and Back Yard Burger subleases around $5,100 a month, leaving Perkins with a deficit of $1,812 owed to Defendants. With the area deteriorating, Mr. Trezevant went to Defendants with the idea of his company, Trezevant Realty, selling Lot 3 and Lot 4. As to the June 29, 2004 memorandum letter that he wrote to Defendants, Mr. Trezevant testified as follows:

> Q. [Y]ou suggest [in the letter] that the properties be sold as soon as possible. . . .
> A. Yeah. I mean, I knew of some additional [business] closings. . . . [The area] just was getting worse and worse.
> Q. And then in the next sentence, which is the final sentence, you state, "If you agree, come up with your asking price to go back to Back Yard Burger and Circle K. When they are sold, you will receive the net proceeds and our lease with you will terminate."
> A. Uh-huh.
> Q. When they sold, meaning the Lot 3 and 4. Isn't that right?
> A. Well, I mean one could buy them both.
> Q. But you're referring to both of them, are you not?
> A. Well, this was - - yes.

When questioned concerning his understanding of the authorization letter, Mr. Trezevant testified:

> Q. What does net sale of [$350,000] to the owners mean?
> A. That means the owner's desire was to get 350,000 for the property.
> Q. Well, what has net got to do with it?
> A. That's - - that's the minimum that they were going to take to let [Perkins] off the ground lease.
> . . .

Q. So right there he is authorizing you to proceed with the sale of the properties for a net sales of $350,000 dollars to the owner. Doesn't net sale of 350,000 dollars mean all costs, expenses, commissions and whatever are deducted from whatever the sales price is. . . .

A. Well, I didn't - - I didn't interpret it that way.

. . .

A. [Trezevant Realty was not] supposed to - - we were not going to get a dime of the first three fifty.

. . .

Q. [D]oesn't this [letter] talk about a sale, the sale of the property?

A. Well, property is singular, it looks like to me.

. . .

A. Well, I mean - - I mean, you could sell Lot 3 and 4 together. You could sell them independent. . . . We were trying to figure out how we could get out of the ground lease with Perkins [ ] and how Trezevant Realty [ ] could help them sell those two lots.

Mr. Trezevant testified that he requested on behalf of Perkins a lease termination from Defendants when the sale of Lot 3 closed, but that no written termination agreement was entered into. At the time of the Circle K closing, Perkins no longer had Back Yard Burger as a subtenant, as they had already vacated the building on Lot 4. Perkins stopped paying rent and property taxes on Lot 4 when the sale of Lot 3 closed. The Court questioned Mr. Trezevant as to his position on the termination of the Perkins/Defendant lease:

Q. Is it your position that the sale of Lot 3 and part of Lot 4 to [Circle K] eliminated Perkins' remaining obligation to the owners on Lot [4]? Is that what you're saying?

A. My contention is that the ground lease was for Lots 3 and 4 and for [Defendants] to sell any part of Lots 3 and 4 without me approving it terminates my ground lease . . . .

As to the alleged commission, the following exchange occurred:

Q. [T]he reason Trezevant Realty has sued for the commission was you brought a contract to [Defendants] for 60,000, and they didn't accept it. But nevertheless, you think you're entitled to your commission?

A. I brought them a contract for 60,000 more than the specified purchase price desired.

. . .

Q.      [I]f you [Trezevant Realty] had brought them a contract for
        30,000 and they didn't accept it, they nevertheless owed you
        a commission?
. . .
A.      Yes.
Q.      Thirty thousand dollars?
A.      Yes.

Jackie Welch testified on behalf of Defendants as to his dealings with Mr. Trezevant.  He testified that Mr. Trezevant wished to sell Lot 3 and Lot 4 because Perkins was losing money on the two properties, and that Mr. Trezevant estimated the value of Lot 3 at $200,000 and Lot 4 at $150,000.[4]  Mr. Welch explained that he spoke with the other Defendants and they agreed to allow Trezevant Realty to sell Lot 3 and 4, as "we were trying to accommodate [Mr. Trezevant]."

As to the authorization letter, Mr. Welch testified as follows:

> And I wrote a letter, and the intent - - and I know they've tried to put
> a different spin on this letter - - the intent of that letter was simply
> this: [Mr. Trezevant], you've told us - - you've given us a breakdown
> on the value of the property, two hundred for the corner, one hundred
> fifty for the other.  That's 350,000 dollars.  Bring us a contract for
> 350,000 dollars net to us, and we'll pay you a commission.  If you get
> anything above that - - if you get another 5,000 or 10,000, we'll pay
> you a commission, but not to exceed 10 percent.
>         It could be 1 percent.  It could be 5 percent, but it's not going
> to exceed 10 percent.  He brought us a contract for three fifty for one
> lot.  . . .

Mr. Welch explained "net" $350,000 as follows: "that's how much they're going to walk away from the closing with.  They don't have to pay any commissions out of that."  He further explained: "If [Mr. Trezevant] had brought a contract for 600,000 dollars, we would have paid him 60,000 dollars, not everything above three fifty."

Mr. Welch testified that the authorization letter was "by no means an exclusive listing.  We did have other people showing the property.  My daughter is a licensed broker.  My daughter showed that property during that same period of time, so [Mr. Trezevant] wasn't the only one that was working on this piece of property."  Mr. Welch also testified that a second realty company that also was trying to sell or lease the property.

---

[4] As to the June 29, 2004 letter written by Mr. Trezevant, Mr. Welch denied that it was his idea to sell Lot 4 for $150,000, or that he was in agreement that Defendants give Back Yard Burger the option to purchase the site for 12 months.  Mr. Welch maintained that he relied on Mr. Trezevant's valuation of the property.

Mr. Welch explained the telephone conversation between him and Mr. Trezevant that occurred prior to the Lot 3 closing:

> I explicitly explained to [Mr. Trezevant], "John, we're not terminating this lease. You're still going to be responsible for the rent on the Back Yard Burger property if this closes."
> "Oh, no, I don't want - - that's not what I understood."
> "Well, that's the way it's going to be or we're not closing." . . . [W]e've got two properties. You have broken the rent down 4,000 and something odd dollars for Circle K, 2,000 and something odd dollars for Back Yard Burger, a total of 6900 dollars.
> On your checks you send us each month, there's a breakdown on how much you're paying for Circle K and how much you're paying for Back Yard Burger. It's been real simple.

Mr. Welch's attorney, Cary Califf, testified that he was in the room with Mr. Welch when this conversation occurred. He testified that Mr. Welch put Mr. Trezevant on speaker phone and he heard Mr. Welch explain to Mr. Trezevant:

> [W]e would terminate that portion of the ground lease with Circle K . . . . Mr. Trezevant had wanted to terminate the entire ground lease . . . . [I] think that Mr. Welch had - - had said that he was not going to release the balance of the property but if Mr. Trezevant wanted to prepare some type of modification to the ground lease - - I don't know what that means[,] . . . but he would have to prepare it and send it to Mr. Welch for him to review with [the other Defendants].

Mr. Trezevant, on the other hand, denied that such a conversation took place.

As to whether the lease terminated upon the sale of Lot 3, Mr. Welch testified:

> Q.    [M]r. Trezevant testified that it cannot be done, that an owner of a property cannot sell property subject to a ground lease without getting the ground lessee's permission?
> A.    Well, evidently he's wrong because it closed.

According to Mr. Welch, Defendants did terminate the lease as to Lot 3 when that sale closed,[5] but they were still expecting rent for the Back Yard Burger Lot 4 property.

As to the $60,000 offer that Mr. Trezevant procured for Lot 4, Mr. Welch testified:

---

[5] Mr Welch later testified that there was nothing in writing terminating the lease as to Lot 3, but that Defendants simply did not seek to collect that portion of the rent.

Q. Okay. Was the contract acceptable to you?
A. Not in the least.
Q. Tell me why it was not acceptable to you.
A. Well, [Mr. Trezevant] had already told us that we would - - the property was going to have a value of 150,000 dollars and we certainly weren't going to sell for 40 percent of what he said it was worth.
Q. Did you have any conversations with Mr. Trezevant that you did not find his contract to be acceptable?
A. I told him that.
. . .
Q. If he had brought you a contract for, say, 100,000 dollars on the remaining lot - -
A. I think we would have taken it. If the conditions were acceptable, yes, I think we would have taken it.

Mr. James Threlkeld, Jr. testified briefly that the $60,000 contract procured by Mr. Trezveant was unacceptable in that it contained certain contingencies:

Q. Did you accept [the offer]?
A. No, I did not.
. . .
A. The money offer was unacceptable, and the terms and the conditions of the offer were unacceptable.
. . .
Q. You weren't agreeing to pay for removing the [Back Yard Burger] property?
A. No.
Q. Well, what about [the condition that] . . . the purchaser should have a 30 day inspection period. You weren't agreeable to that?
A. No, not at all.
Q. Or he may determine whether it is or isn't suitable for his purpose?
. . .
A. That's unacceptable also.

He further testified that he attempted to collect rent from Perkins on "numerous" occasions. Specifically, he attempted to collect the rent on Lot 4 in October of 2004 and November of 2004, and January of 2005. He testified that Mr. Trezevant claimed that the lease was terminated when Lot 3 sold, and refused to pay.

The trial court entered an order of judgment on June 18, 2007. The court found as follows concerning Mr. Trezevant's claim that he was entitled to a real estate commission:

> 2. The basis of Trezevant's claim is a letter written by Waymon H. "Jackie" Welch, Jr., dated August 23, 2004. . . .
>
> 3. Trezevant brought a buyer for Lot 3, or the Circle K lot, for $350,000.00. Trezevant was not paid a real estate commission at the closing of Lot 3 on September 29, 2004.
>
> 4. Trezevant brought an offer for Lot 4 for $60,000.00, and the offer contained certain contingencies.
>
> 5. Welch/Threlkeld refused the offer and counter-offered, which counter offer was not accepted. Welch/Threlkeld then terminated any agency relationship with Trezevant and retained another real estate company to market and selling [sic] the remaining Lot 4, or Back Yard Burger.
>
> 6. Welch/Threlkeld found a buyer through the efforts of the other real estate company, and Lot 4 was sold on May 3, 2007, for $100,000.00.
>
> 7. The Court finds that Trezevant did not have an exclusive listing agreement with Welch/Threlkeld, and that Welch/Threlkeld had the option to hire others to sell their property. The Court further finds that Welch/Threlkeld had the option to accept or reject a contract, and that the [$60,000] contract had contingencies which were unacceptable to Welch/Threlkeld, as well as price, which was also unacceptable.
>
> 8. The Court finds that Trezevant Realty Corporation is not entitled to collect a real estate commission . . . .
> . . .

As for the third-party complaint against Perkins, the court found:

> 10. [T]he ground lease did not split or apportion the rent between the two lots. However, Perkins, in its lease payments, internally allocated $4,147.20 to Lot 3, Circle K; and $2,764.80 to Lot 4, Back Yard Burger.
> . . .
> 12. At the closing of Lot 3 on September 29, 2004, the ground lease was not terminated, despite requests from Trezevant, on behalf of

Perkins, that it be terminated. The Court finds that if the ground lease was not terminated, then it still exists.

. . .

14. The Court finds that the ground lease was in effect as to Lot 4, Back Yard Burger, and that therefore, rents of $2,764.80 per month are owed for the remaining lease term of 30 months, from October 1, 2004, to March 31, 2007.

. . .

The court concluded that Perkins owed the Defendants $83,000 in rent and $15,000 in real estate taxes, but reduced the rent obligation by $25,000 for Defendants' failure to mitigate. Thus, the trial court entered a final judgment against Perkins in the amount of $73,000.

## II. ISSUES PRESENTED

Mr. Trezevant raises three issues for our review, which we have rephrased and consolidated as follows:

1. Whether the trial court erred in finding that Trezevant Realty was not entitled to a sales commission of $41,000.

2. Whether the trial court erred in ruling that Perkins owed Defendants $73,000 in rent.

In addition, Defendants raise the following issue: whether the trial court erred in reducing the judgment by $25,000 because of their failure to mitigate damages.

## III. STANDARD OF REVIEW

This is an appeal from a bench trial, and thus we review the record de novo, and presume that the trial court's findings of fact are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo, with no presumption of correctness. As to findings of fact that hinge on witness credibility, we afford the trial court's decisions great weight. "With respect to a trial court's findings of credibility and the weight given to oral testimony, we accord considerable deference in those circumstances on review because the trial court has the opportunity to observe the witnesses' demeanor and hear the in-court testimony." *Interstate Mechanical Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 678 (Tenn. 2007) (citations omitted). The trial court's credibility findings "may be inferred from the manner in which the court resolves the conflicts in the testimony and decides the case." *Id.* (citing *Rhodes v. Capital City Ins. Co.*, 154 S.W.3d 43, 46 (Tenn. 2004)).

## IV. DISCUSSION

### A. Real Estate Commission

First, Mr. Trezevant argues that his company is entitled to a $41,000 real estate commission, "having ultimately procured a total sales price of $410,000 for the sale of Lots 3 and 4 pursuant to the Agreement[.]" The Threlkeld Defendants argue that Defendants had no obligation to pay Trezevant Realty a commission because Mr. Trezevant did not accept the August 2004 offer contained in the authorization letter according to its terms. The Welch Defendants point out that the trial court found that Trezevant Realty did not have an exclusive listing, and thus, they did not owe him a commission because another realty agency brokered the sale.

Whether a broker is entitled to a commission is a contractual matter. *Mande Realty v. Deerhead Resort, Inc.*, 1988 WL 5694, at *2 (Tenn. Ct. App. Jan. 29, 1988) (citing *Robinson v. Kemmons Wilson Realty Co.*, 41 Tenn. App. 297, 316, 293 S.W.2d 574, 582-83 (1956)). Our Supreme Court has explained that when a dispute arises concerning contract interpretation, we are to "ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). Determining the intent of the parties is usually treated as a question of law, "because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Id.* (citations omitted). First, we must determine whether the language of the contract is ambiguous. *Id.* If the language is ambiguous, then we must apply established rules of construction to determine the parties' intent. *Id.* An ambiguity exists if the words in a contract are of uncertain meaning and are susceptible to more than one reasonable interpretation. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (citation omitted).

As to the issue of whether Trezevant Realty is entitled to a commission, we first look to the authorization letter:

> This is authorization for you to proceed with the sale of the Circle K and Back Yard Burger properties . . . for a net sales of $350,000.00 to the owners. Any amount in excess of $350,000.00 received from the sale of the property will be paid to you [Mr. Trezevant] in the form of a real estate commission not to exceed ten percent (10%).

In this case, parol evidence of the circumstances surrounding this agreement was necessary in order to determine the intent of the parties. "[W]hen a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Id.* at 612. Several parts of this authorization letter are ambiguous, including whether the two lots were to be sold in one sale, and the meaning of "$350,000 net" to the owners.

Mr. Trezevant argues that "where an agent has performed on his or her part all acts to satisfy any sales conditions, the agent cannot generally be deprived of the agent's right to a commission due to the principal's refusal to close the real estate sale." Mr. Trezevant cites to **Hammond v. Herbert Hood Co.**, 31 Tenn. App. 683, 695, 221 S.W.2d 98, 103 (Tenn. Ct. App. 1948), but the reasoning of that case is not applicable to this situation. In **Hammond**, this Court stated:

> [W]here a broker has been employed to sell real estate[,] he is entitled to his commissions [when] he produces a party *who is acceptable to the owner*, and who is able, ready and willing to buy *on the agreed terms*. And this is true even though the sale is not ultimately consummated, when the consummation is prevented by the fault, refusal, or defective title of the principal.

*Id.* (emphasis added). In this case, the trial court made the finding of fact that the proposed $60,000 sales contract was unacceptable to Defendants, due to both the price and the contingencies. We find that the evidence does not preponderate against this finding. And the fact that the parties stipulated that Mr. Trezevant produced a ready, willing, and able buyer is of no consequence, as there was no sales contract entered into, as the terms of the agreement were unacceptable to Defendants. "A real estate broker is entitled to his commission when he procures a purchaser *who is acceptable* to the seller and who is ready, willing and able to buy on the seller's terms." **Parks v. Morris**, 914 S.W.2d 545, 548 (Tenn. Ct. App. 1995) (our emphasis) (citing *Cheatham v. Yarbrough*, 90 Tenn. 77, 79, 15 S.W. 1076 (1891)).

Basically, Mr. Trezevant is now arguing that the authorization letter is not ambiguous, and thus the fact that the $60,000 contract contained "contingencies" is irrelevant, as the authorization letter mentioned nothing concerning contingencies and he reached the $350,000 sales price. Seemingly contradictorily, Mr. Trezevant argues that the Perkins lease obligation ended upon the sale of Lot 3, yet the authorization letter is silent on that issue, and to make such a conclusion, one would have to go beyond the four corners of the authorization letter. We also point out that neither party objected to the introduction of the extrinsic evidence at trial.

The trial court accepted the fact that Mr. Trezevant appraised Lot 4 with a value of $150,000, and thus, Defendants found unacceptable a contract offering $60,000 with contingencies. Mr. Trezevant argues that "an owner's desire to receive a better price for property will not abrogate the owner's duty to pay an agent a real estate sales commission if the agent procures a ready, willing and able purchaser to buy at the price set forth in the contract." The problem with this argument is that parol evidence established that the parties intended that the $350,000 price come from the sale of Lot 3 for $200,000 and Lot 4 for $150,000. Thus, although Mr. Trezevant procured a ready, willing, and able purchaser for Lot 4, it was not for the $150,000 price agreed on by the parties. "[T]o recover on any contract the proof must show there was compliance with the terms thereof." **Johnson v. Hudson**, 614 S.W.2d 807, 808-09 (Tenn. Ct. App. 1981) (citation omitted).

-14-

The Threlkeld Defendants argue that they intended that Mr. Trezevant procure the sale of both lots in one closing, and because this did not occur, Mr. Trezevant is not entitled to a commission. It appears, however, that Mr. Welch's testimony conflicted on that issue:

> Q. And when you wrote the letter, did you intend that [Mr. Trezevant] was going to make one sale of the properties?
> A. Yes. Well, I was under the impression that the value of the two lots, two hundred and one hundred fifty, totaled three fifty, and that he would bring us a contract for 350,000 dollars net to us.

On cross examination, however, Mr. Welch testified as follows:
> Q. And it is your testimony, I believe, that if these properties net - - were sold net of a commission [sic] - - both of them, right - - for 350,000 dollars, the ground lease would terminate; correct?
> A. That's correct. That's correct.
> Q. Was there ever any discussion that the 350,000 dollars had to be derived from the sale of both of the properties at the same time, Mr. Welch?
> A. No.
> Q. So you could sell one for some sum of money and another for another? You were looking for the total of three fifty?
> A. Yes, I was.

We need not answer this question, because as fully discussed, we affirm based on the trial court's reasoning.

The trial court found that Mr. Trezevant did not have an exclusive listing. The next issue becomes, then, whether Defendants terminated Mr. Trezevant's agency authority in bad faith, preventing him from earning his commission. "[W]here no sale was made by the agent before termination of the agency, the owner may sell to a purchaser without liability for the broker's commission, if the owner acts in good faith without hindrance or interference of the agent in closing the sale before the agency terminated." *Robinson v. Kemmons Wilson Realty Co.*, 41 Tenn. App. 297, 317, 293 S.W.2d 574, 583 (Tenn. Ct. App. 1956). The trial court found that Defendants had legitimate reasons for not accepting the $60,000 offer on Lot 4, and we find nothing in the record to disturb this finding. In sum, we agree with the trial court that Trezevant Realty is not entitled to a sales commission.

### B. Termination of the Lease

-15-

Perkins contends that the lease terminated on September 29, 2004, when the sale of Lot 3 closed, and that the trial court erred in entering a judgment of $73,000. We disagree.

A written contract "may be modified by the express words of the parties in writing, as well as by parol. Whether written or oral, modifications of written contracts must be with the consent of both parties." ***Galbreath v. Harris***, 811 S.W.2d 88, 91-92 (Tenn. Ct. App. 1990).

Much parol evidence was introduced at trial as to the meaning of the authorization agreement and under what circumstances the lease would terminate. Defendants contended that the lease would terminate upon sale of both Lot 3 and Lot 4. Mr. Trezevant contended that the lease terminated upon the sale of Lot 3, because the $350,000 target was met. As we have already discussed, the authorization letter is ambiguous, and the trial court relied on parol evidence. Our Supreme Court has stated that when "the parole evidence is conflicting or may lead to more than one conclusion, the doubtful parts may be submitted to the fact-finder for resolution." ***Bratton v. Bratton***, 136 S.W.3d 595, 602 (Tenn. 2004) (citing *Barker v. Freeland*, 91 Tenn. 112, 18 S.W. 60, 61 (Tenn. 1892); *Forde v. Fisk Univ.*, 661 S.W.2d 883, 886 (Tenn. Ct. App. 1983)). Looking to the record, we agree that the parties intended that Mr. Trezevant sell both lots in order for Perkins' lease to terminate. Mr. Trezevant's June 29 letter to Defendants states that "[w]hen *they* are sold, you would receive the net proceeds and our lease with you would terminate." (our emphasis). Mr. Welch testified that if Mr. Trezevant would have sold both Lot 3 and Lot 4 for $350,000, then the Perkins lease would terminate. While Mr. Trezevant focuses on the sale amount, the intent behind the agreement was to get rid of both pieces of property.

We next point out that the lease provided,"[n]o waivers, alterations, or modifications of this Lease or any agreements in connection therewith shall be valid unless in writing duly executed by both Landloard and Tenant herein." As to this point, Perkins argues that it would be inequitable to allow Defendants to use this clause in the lease in support of their argument that the lease could not be terminated absent written modification, because no written modification was entered into with regard to Lot 3. We read this as Perkins arguing waiver on the part of Defendants. The fact that Defendants did not attempt to collect rent in regard to Lot 3 and did not enter into a written modification does not prevent Defendants from collecting rent for Lot 4. *See generally* ***Brooks v. Networks of Chattanooga, Inc.***, 946 S.W.2d 321, 326 (Tenn. Ct. App. 1996) ("Applying the clear provisions of the non-waiver agreement to this case, the fact that plaintiff accepted the monthly rental checks and did not indicate that he intended to collect the double rent until June 1993 does not constitute a waiver of any rights of the landlord under the contract absent a written agreement to the contrary.").

Next, Perkins argues that Defendants did not make a written demand for rent until one year later, when Trezevant Realty filed suit.[6] First, we find nothing in the lease that would require Defendants to make a written demand for rent. Second, Mr. Threlkeld testified that he made numerous calls demanding rent, whereas Mr. Trezevant testified that no such demands were made after the Lot 3 sale. The trial court was in the better position to determine witness credibility, and we find no error here. *See **Keyt v. Keyt***, 244 S.W.3d 321, 327 (Tenn. 2007) ("Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court.").

Perkins argues that "the closing of Lot 3 without a ground lease termination evidences Defendants' bad faith toward Perkins." We disagree, as the parties intended that both lots would be sold. While Perkins argues that the parties "did have an implied and/or oral agreement" that the lease would terminate upon the sale, as already discussed, the trial court was in the better position to determine the parties' intent. We also point out that neither Trezevant Realty nor Perkins alleged a breach of implied contract claim, and thus the issue is waived.

Perkins goes on to argue that the sales contract of Lot 3 states that the sale is "contingent upon simultaneous cancellation of the master ground lease and sublease at closing." This argument basically rehashes Mr. Trezevant's position at trial that the sale of Lot 3 could not occur without the termination of the underlying lease. This is an incorrect assumption. A tenant does not have "the option to go or to stay when the leased premises are sold. His consent to a sale is not necessary . . . ." ***Hughes v. Donlon***, 261 S.W. 960, 965 (Tenn. 1924) (citations omitted). We also point out that Perkins was not a party to the sales contract, and did not sign the contract.

Finally, Perkins argues that "Defendants cannot avoid the Ground Lease termination (or Trezevant's sales commission as addressed *infra*), by contending that the August 23, 2004 Agreement was a separate contract which was fulfilled and terminated at the time of the closing of the sale of Lot 3 for $350,000." This is the same argument made by Trezevant Realty, worded differently. We have already determined that Trezevant Realty is not entitled to a real estate commission.

---

[6] Here, Perkins is referring to a letter dated August 29, 2005, which states:
> This letter shall serve as official notice to Perkins [ ] that the Ground Lease Agreement [ ] is and has been in default from the date of the last rental payment in August 2004, and is hereby cancelled. Without full payment owed or objection from you within the next seven (7) days, the undersigned will take possession of the abandoned property and proceed to mitigate its diminishing value as much as possible.

### C. Mitigation of Damages

Finally, Defendants argue that the trial court erred in finding that they failed to mitigate damages, thus reducing the judgment by $25,000. We agree.

This Court has said the following concerning the doctrine of mitigation of damages:

> [O]ne who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.

*Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 353 (Tenn. Ct. App. 2007) (quoting *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971)). The wronged party is under a legal duty to use reasonable efforts to minimize his or her loss. *Id.* (citations omitted); *see also Carolyn B. Beasley Cotton Co. v. Ralph*, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000).

In a breach of contract claim between the lessor and the lessee for the collection of rent, the lessor "must do what is fair and reasonable to reduce his damages." *Nashland Associates v. Shumate*, 730 S.W.2d 332, 333 (Tenn. Ct. App. 1987) (citation omitted). The lessee has the burden of establishing the lessors' failure to mitigate their damages. *Hailey v. Cunningham*, 654 S.W.2d 392, 396 (Tenn. 1983).

In the present case, Mr. Welch testified that Defendants employed two different companies to sell or lease Lot 4, and placed a sale sign on the property. Furthermore, Mr. Trezevant offered no proof of additional measures Defendants could have taken to sell or lease Lot 4. *See Amberjack, Ltd. v. Thompson*, No. 02A01-9512-CV-00281, 1997 WL 613676, at *7 (Tenn. Ct. App. Oct. 7, 1997). We agree with Defendants that the trial court erred in finding that it failed to mitigate its damages, and thus we reverse the finding that reduces the judgment by $25,000.

## V. CONCLUSION

We affirm for the reasons stated herein. We reverse the reduction of the judgment due to failure to mitigate damages, and remand for the entry of an order of judgment against Perkins in the amount of $83,000 in rent and $15,000 in real estate taxes. Costs of this appeal are taxed to Appellant, Trezevant Realty Corporation, A Tennessee Corporation, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.